RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0212p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

IRIS LISSETH RODRIGUEZ DE PALUCHO; C. B. P. R.;
JOSE MIGUEL PALUCHO LARA; M. A. P. R.,

                               *Petitioners*,

    *v.*

MERRICK B. GARLAND, Attorney General,

                               *Respondent*.

No. 21-3611

─────────────────

On Petition for Review from the Board of Immigration Appeals.
Nos. A 209 848 963; A 209 848 964; A 213 139 785; A 213 139 786.

Decided and Filed: September 9, 2022

Before: SILER, CLAY, and MURPHY, Circuit Judges.

─────────────────

## COUNSEL

**ON BRIEF:** Kirby J. Fullerton, CARMANFULLERTON, PLLC, Lexington, Kentucky, for Petitioners. Matthew A. Spurlock, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

    MURPHY, J., delivered the opinion of the court in which SILER, J., joined. CLAY, J. (pp. 15–24), delivered a separate dissenting opinion.

─────────────────

## OPINION

─────────────────

    MURPHY, Circuit Judge. Nobody would dispute that El Salvador has a serious problem with violence from private gangs like MS-13. That gang's repeated crimes—including robbery, extortion, and death threats—drove Iris Lisseth Rodriguez de Palucho; her husband, Jose Miguel Palucho Lara; and their two children to seek asylum and withholding of removal in the United

States. Yet those remedies have long been interpreted to contain a "state-action" element, meaning that immigrants must show that they fear violence in their countries from the government or from parties that the government is unable or unwilling to control. The Board of Immigration Appeals denied relief to Iris and Jose because they failed to show that the Salvadoran government was unable or unwilling to control MS-13. Iris and Jose now claim that the Board overlooked reports about the general conditions in El Salvador. They also argue that these reports would compel any reasonable factfinder to conclude that the Salvadoran government could not protect them from the gang. This case thus requires us to consider when the Board's failure to expressly discuss certain evidence compels a remand for it to reconsider factual findings. It also requires us to consider when a country's general conditions can permit a presumption that its government cannot protect its populace from private harm. Ultimately, because the Board recited the proper legal standards and because we must defer to its factual findings, we deny the petition for review.

I

Iris and Jose, natives of El Salvador, lived with their two small children in Usulután, a part of the country that they believed to be controlled by MS-13. They ran a small retail business (offering ice cream, cellphone minutes, and money transfers) and a mill (making flour for tortillas). Jose also sold medicine for a separate company.

Iris and Jose's business unfortunately brought them to the attention of MS-13. In May 2016, a gang member called Jose's cellphone, demanded $800, conveyed details about Jose's family, and threatened to kill the family if Jose did not pay. After Jose sent the gang $200 through a bank transfer, this gang member claimed that MS-13 would leave the family alone. The reprieve did not last long. Other gang members robbed Jose and a colleague at gunpoint when the two coworkers were delivering medicine in a town about thirty minutes from where they lived. On a later trip to the same town, armed gang members again threatened to kill Jose and his colleague. Only the intervention of the colleague's relative, a fellow gang member, secured their release. At this point, Jose decided that he could not safely travel.

Jose did not report the gang's crimes to the police. He knew that the police conducted daily raids in his neighborhood to combat gang activity. But he also believed that the gangs had infiltrated the government. He feared that MS-13 would learn of his complaints and kill him if he asked for help. (Incidentally, the gang member who extorted Jose of $200 had initially told him to deliver the money to a park in front of the Usulután mayor's office before requesting the bank transfer. The mayor was subsequently arrested for helping gang members collect "rent.")

Yet Jose did feel safe to contact the police about other matters. When an uncle demanded that Jose move out of the house in which he was living after his grandfather's death, he obtained a restraining order against the uncle. Officers routinely checked on the family to ensure that Jose's uncle complied with the order. These visits led members of MS-13 to interrogate Jose about whether he had been informing on the gang. They reiterated that they would kill him if he cooperated with the police.

Faced with ongoing gang harassment, Jose left El Salvador in October 2016. He and one of the couple's children reached the United States the next month. By August 2017, gang members began to demand monthly "rent" from Iris and threatened to kill her and her son if she did not comply. She paid twice, but the gang continued to demand more. Terrified, Iris sold her business and moved in with her mother. She also did not report the crimes to the police. Eventually, she fled for the United States. Iris arrived here with the couple's other child in October 2017.

The government initiated removal proceedings against the family. They responded by applying for asylum and withholding of removal. (The family also sought relief under the Convention Against Torture but have abandoned that claim.) Iris and Jose testified at a hearing. They also introduced, among other evidence, two country-condition reports about gang activity in El Salvador. Admin. R. (A.R.) 331–412. The reports corroborated their testimony. A 2016 report from the United Nations High Commissioner for Refugees suggested that victims of gang extortion like Iris and Jose generally do not complain to the police for fear that the gangs will retaliate against them. A.R. 390. Similarly, a 2017 State Department report noted that the government in many areas could not guarantee the public's freedom of movement "due to criminal gang activity." A.R. 348. In other respects, though, the government had made progress

in combatting gangs.  The State Department's report suggested that the government had started a new internal-investigations unit that had removed many gang-affiliated officials (like the Usulután mayor).  A.R. 340.  The report also cited a poll showing that 63% of the public found that the police were more effective as compared to the prior year.  *Id.*

After the hearing, an immigration judge denied relief and ordered the family's removal to El Salvador.  While finding Iris and Jose credible, the judge concluded that their evidence fell short of meeting several required elements for the family to obtain asylum or withholding of removal.  As relevant here, these laws required the family to show that the harm that they suffered in El Salvador had been inflicted by private actors that the government was unable or unwilling to control.  According to the judge, the family failed to prove that the Salvadoran government was unable or unwilling to control MS-13.  The Board of Immigration Appeals upheld the judge's decision solely on this ground.  The family has timely filed a petition for review in our court.

II

The asylum statute permits the Attorney General to grant relief from removal to immigrants who qualify as "refugee[s]."  8 U.S.C. § 1158(b)(1)(A).  The immigration laws define "refugee" to cover those who, among other things, have a "well-founded fear of persecution" in their home countries.  *Id.* § 1101(a)(42)(A).  The laws do not define "persecution."  But the Board and courts have long interpreted this word to require that the feared harm be inflicted either "by the government or by private parties that the government is 'unable or unwilling to control.'"  *Ortiz v. Garland*, 6 F.4th 685, 688 (6th Cir. 2021) (quoting *Matter of Acosta*, 19 I. & N. Dec. 211, 222 (B.I.A. 1985)).

The withholding-of-removal statute, by comparison, compels the Attorney General to grant relief from removal to immigrants whose "life or freedom would be threatened" in their countries.  8 U.S.C. § 1231(b)(3)(A).  Since 1980, this statute has not contained the word ("persecution") that the courts have used to incorporate the state-action element into the asylum statute.  *See INS v. Stevic*, 467 U.S. 407, 410–11, 421 n.15, 428 n.22 (1984).  Yet the Board has relied on legislative history to interpret the phrase "life or freedom would be threatened" to mean

"persecution" and retain this state-action element. *See Matter of McMullen*, 17 I. & N. Dec. 542, 544–45 (B.I.A. 1980). Since then, circuit courts have unanimously followed suit (albeit without much reasoning). *See Gramajo-Lopez v. Holder*, 572 F. App'x 346, 347 (6th Cir. 2014) (per curiam); *Khalili v. Holder*, 557 F.3d 429, 435–36 (6th Cir. 2009); *see also Sanchez-Vasquez v. Garland*, 994 F.3d 40, 46 (1st Cir. 2021); *Galeas Figueroa v. Att'y Gen.*, 998 F.3d 77, 86–87 (3d Cir. 2021); *Perez v. Holder*, 516 F. App'x 327, 328 (5th Cir. 2013) (per curiam); *Cruz-Martinez v. Sessions*, 885 F.3d 460, 463 (7th Cir. 2018); *Prieto-Pineda v. Barr*, 960 F.3d 516, 520 (8th Cir. 2020); *Amparo-Gomez v. Garland*, 849 F. App'x 219, 219 (9th Cir. 2021) (per curiam).

Iris and Jose thus concede that they must prove that the Salvadoran government was "unable or unwilling" to control the gang members who extorted them. What does it mean for a government to be "unable or unwilling" to control a private actor? Some of our cases have noted that immigrants must show that they cannot "reasonably expect the assistance of the government" in deterring the criminal actor. *Juan Antonio v. Barr*, 959 F.3d 778, 793 (6th Cir. 2020) (citation omitted). Others have noted that the government must have either "condoned" the private violence "or at least demonstrated a complete helplessness to protect the victims." *Kere v. Gonzales*, 252 F. App'x 708, 712 (6th Cir. 2007) (citation omitted); *see Ortiz*, 6 F.4th at 691. (Some courts have suggested that these standards are functionally identical. *See Galeas Figueroa*, 998 F.3d at 87–90 (citing cases).)

Apart from the controlling legal standard, our cases have also provided instructions on how the Board and courts should go about resolving whether a government was unable or unwilling to control a private criminal. As for the Board, it must consider the totality of the circumstances to answer this question. *See Ortiz*, 6 F.4th at 689 (citing *Juan Antonio*, 959 F.3d at 794). Those circumstances include both specific evidence about the government's response to the crimes inflicted on an immigrant and general evidence about a country's ability to deter those crimes. *K.H. v. Barr*, 920 F.3d 470, 476 (6th Cir. 2019). As for the courts, they must treat the Board's answer to this question as an "administrative finding[] of fact[.]" 8 U.S.C. § 1252(b)(4)(B); *Ortiz*, 6 F.4th at 688–89 (citing cases). The finding is thus "conclusive unless

any reasonable adjudicator would be compelled to conclude to the contrary[.]"   8 U.S.C. § 1252(b)(4)(B).

Here, Iris and Jose do not claim that the Board misinterpreted the law governing whether El Salvador was unable or unwilling to control the gang members who extorted them.  To the contrary, the Board took the governing legal rules straight from our caselaw.  It quoted *Juan Antonio* for the proposition that this question turns on whether an immigrant can "reasonably expect" government protection.  A.R. 4 (quoting 959 F.3d at 795).  And it cited *K.H.* for the proposition that an adjudicator should look to two categories of information—the immigrant's specific facts and the country's general conditions.  *Id.* (citing 920 F.3d at 476).

The Board then considered both categories of information.  As a specific matter, it pointed out that Iris and Jose did not report any of the gang members' crimes to the police.  Yet the couple had previously received police assistance in response to threats from Juan's uncle and the police had conducted daily raids in their neighborhood to combat gangs.  A.R. 4–5.  As a general matter, the Board recognized the country's "problems with gang members and the evidence of corruption of some officials."  A.R. 4.  But it credited the immigration judge's conclusion that "the government in El Salvador is taking steps to protect its citizens from gang members."  A.R. 5.

These findings were "reasonable."  8 U.S.C. § 1252(b)(4)(B).  Our court has repeatedly relied on similar logic when upholding similar orders.  Like the Board, we have explained that an immigrant's failure to report crimes to the police will make it more difficult to show that the government was unable or unwilling to control the criminals.  *See, e.g.*, *Seye v. Barr*, 768 F. App'x 381, 383 (6th Cir. 2019); *Ralios Morente v. Holder*, 401 F. App'x 17, 24 (6th Cir. 2010); *cf. Sanchez-Amador v. Garland*, 30 F.4th 529, 534 (5th Cir. 2022).  And like the Board, we have relied on evidence that a government had "tak[en] steps" to deter a crime as a basis to find that the country's conditions did not mandate a different result.  *Barcenas-Sales v. Garland*, 2022 WL 620153, at *3 (6th Cir. Mar. 3, 2022) (quoting *Ortiz*, 6 F.4th at 690); *Sebastian-Gaspar v. Garland*, 852 F. App'x 973, 975 (6th Cir. 2021); *José-Tomás v. Barr*, 822 F. App'x 354, 358–59 (6th Cir. 2020); *Velasquez-Rodriguez v. Whitaker*, 762 F. App'x 241, 245 (6th Cir. 2019) (per curiam); *Hamzah v. Holder*, 428 F. App'x 551, 558 (6th Cir. 2011).  Some of these cases even

involved claims of gang violence in El Salvador like the claims at issue in this case. *See, e.g.*, *Rosa-Mejia v. Garland*, 854 F. App'x 9, 14 (6th Cir. 2021); *Gavidia-Escobar v. Barr*, 769 F. App'x 276, 279–80 (6th Cir. 2019); *Galdamez v. Lynch*, 630 F. App'x 608, 610 (6th Cir. 2015) (per curiam).

Iris and Jose respond with alleged procedural and substantive errors. Procedurally, they argue that the Board overlooked the country-condition reports about gang violence in El Salvador. Substantively, they argue that any reasonable adjudicator could reach only one conclusion in light of these reports: that El Salvador was unable to protect Iris and Jose from the gangs that extorted them. Neither argument can overcome the deference that we owe the Board's decision.

1. *Procedural Error.* Some of our cases have vacated and remanded a Board order seemingly because it "disregarded" country-conditions evidence—even if the Board did not obviously commit a traditional legal error (by, for example, misinterpreting the law or applying the wrong test). *See Zometa-Orellana v. Garland*, 19 F.4th 970, 979–80 (6th Cir. 2021); *see also Zuniga-Martinez v. Garland*, 2022 WL 2160668, at *5–6 (6th Cir. June 15, 2022); *Mostafa v. Ashcroft*, 395 F.3d 622, 625–26 (6th Cir. 2005). And here, neither the Board nor the immigration judge *expressly* cited the country-condition reports that Iris and Jose put into the record.

But these two circumstances alone do not automatically justify a remand. That is because our cases have also repeatedly said that the Board (just like a district court or another administrative agency) need not issue an opinion that discusses and rebuts every piece of record evidence that cuts against its findings. *See, e.g.*, *Dieng v. Barr*, 947 F.3d 956, 961 (6th Cir. 2020); *Saleh v. Barr*, 795 F. App'x 410, 418–19 (6th Cir. 2019); *Perez-Aguilon v. Lynch*, 674 F. App'x 457, 465 (6th Cir. 2016); *cf. Rottmann v. Comm'r of Soc. Sec.*, 817 F. App'x 192, 195–96 (6th Cir. 2020); *Qandah v. Johor Corp.*, 799 F. App'x 353, 359 n.5 (6th Cir. 2020). The contrary view would compel a remand in nearly every immigration case because an immigrant will almost always be able to identify *some* piece of evidence that the Board did not expressly consider.

So what is the legal rule that separates the wheat (cases in which we have found no error even though the Board failed to discuss some evidence) from the chaff (cases in which we found that this failure warranted a remand)?  Our precedent leaves this dividing line unclear, but the combination of administrative-law first principles and a recent Supreme Court decision helps clarify things.   Under longstanding administrative law, courts may not impose their own common-law codes of "best practices" on agencies.  *See Garland v. Ming Dai*, 141 S. Ct. 1669, 1677 (2021) (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 524 (1978)); *see, e.g.*, *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101–02 (2015); *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 653–55 (1990).  Rather, Congress sets both the procedures that agencies must follow when making their decisions and the judicial scrutiny that courts may provide when reviewing those decisions.  *See Ming Dai*, 141 S. Ct. at 1677.  If Congress has imposed limits on that judicial review, then, courts must respect its choice.  *See id.*

As the Supreme Court recently explained, Congress has imposed one such limit on our review of agency findings in this immigration context.  *See id.*  As noted, courts must treat "administrative findings of fact" as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary[.]"  8 U.S.C. § 1252(b)(4)(B).  Interpreting this language literally, one could read it to bar us from engaging in any "procedural" review that asks whether the agency adequately addressed the record when issuing the challenged finding of fact.  After all, the text contains no requirement that the agency support its factual findings with an exhaustive opinion ticking through every piece of evidence.  Under this view, we would simply look at the record as a whole and consider whether it contained enough evidence "of a 'kind and quality' that a reasonable factfinder could find sufficient" for the finding.  *Ming Dai*, 141 S. Ct. at 1677 (citation omitted).  Here, for example, this sort of review would require us to ask only whether the entire record—including the country-condition reports that the Board purportedly overlooked—compelled a conclusion that El Salvador was unable or unwilling to control the MS-13 gang members.  If not, the statute would compel us to uphold the Board's contrary finding.

In light of our precedent, however, we do not read the statute in this narrow way. *See Zometa-Orellana*, 19 F.4th at 979–80. Its text leaves room for the sort of procedural review that our cases have undertaken if we read it against background principles of administrative law. In another context, the Supreme Court has interpreted a statute that directed courts to review certain decisions for "substantial evidence" as incorporating the traditional administrative-law rules associated with that phrase. *See T-Mobile S., LLC v. City of Roswell*, 574 U.S. 293, 301–02 (2015). In this context, moreover, we have recognized that § 1252(b)(4)(B) essentially codifies the substantial-evidence test for findings of fact. *See Yu v. Ashcroft*, 364 F.3d 700, 702–03 (6th Cir. 2004); *see also INS v. Elias-Zacarias*, 502 U.S. 478, 481 & n.1 (1992). So those "traditional administrative law principles" apply to this statute too. *Ming Dai*, 141 S. Ct. at 1679.

One of those principles requires courts to evaluate an agency's decision based on the rationale that the agency provided, not on a rationale that a court comes up with after the fact. *See T-Mobile*, 574 U.S. at 301; *Gonzales v. Thomas*, 547 U.S. 183, 186 (2006) (per curiam); *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943). If an agency does not articulate a finding "clearly enough," then, its opinion might bar a court from engaging in the required substantial-evidence review of the *agency's* conclusion (as opposed to the *court's* post-hoc justification). *T-Mobile*, 574 U.S. at 303; *see* Henry J. Friendly, Chenery *Revisited: Reflections on Reversal and Remand of Administrative Orders*, 1969 Duke L.J. 199, 206–09. Yet we must not overread any disclosure-of-reasons requirement that Congress might have impliedly incorporated into a statute calling for substantial-evidence review. That requirement does not give us the authority to grade the agency's "opinion-writing" abilities. *T-Mobile*, 574 U.S. at 308–09 (Alito, J., concurring). Rather, as long as we can reasonably identify the basis for the agency's finding, we cannot hold that the agency committed this type of error even if its logic is of "less than ideal clarity[.]" *Ming Dai*, 141 S. Ct. at 1679 (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)). In short, we cannot vacate a challenged "finding[] of fact" on this procedural ground unless it is so deficient that we cannot even evaluate whether a "reasonable adjudicator would be compelled" to reach the opposite finding. 8 U.S.C. § 1252(b)(4)(B); *see Ming Dai*, 141 S. Ct. at 1679.

Under this standard, we see no procedural error with the Board's decision. The Board articulated the correct legal test requiring it to consider both the immigrant's specific circumstances and the country's general conditions. A.R. 4. Applying this test, the Board found that Iris and Jose failed to show that the Salvadoran government was unable or unwilling to control the gang members who robbed, threatened, and extorted them. A.R. 4–5. It also provided several reasons for this finding, including that Iris and Jose never alerted the police of these crimes and that the police conducted daily raids in their neighborhood to control the gang members there. A.R. 5. The Board thus indicated that Iris and Jose's individual circumstances trumped any evidence showing the government's general inability to control gangs. *Id.* This conclusion necessarily (even if "implicitly") rejected Iris and Jose's reliance on the country-condition reports. *Ming Dai*, 141 S. Ct. at 1679. Confirming this point, the Board specifically cited the two pages that Iris and Jose's brief devoted to this general subject, including the brief's short paragraph discussing those country-condition reports. A.R. 4; *see* A.R. 22–23. The Board thus did not ignore Iris and Jose's argument about the government's overall ineffectiveness. Say what you want about its analysis on the merits. It allows for "meaningful judicial review" under our usual substantial-evidence test. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573 (2019); *see T-Mobile*, 574 U.S. at 303.

Indeed, the Board's conclusion (that Iris and Jose's specific circumstances trumped the general country-conditions evidence) rests on logic similar to the logic in one of our primary cases denying relief in this context. *See K.H.*, 920 F.3d at 478. In *K.H.*, the Board made a generic statement that an immigrant's individual circumstances showed the government's ability to protect the immigrant from abusers, "notwithstanding" the "systemic problems" in the country, such as the "inadequate protections" the government often provided, and the "high levels of crime in the country that are generally hard to control." *Id.* (citation omitted). We affirmed that path to the denial of relief, *id.*, the same path that the Board traveled here.

The same could not be said for the Board's decision in *Zometa-Orellana*. There, we read the Board to have relied "exclusively" on an immigrant's failure to alert the police as the ground for its holding that the immigrant did not prove that the government was unable or unwilling to control domestic abusers. 19 F.4th at 979. So the Board's failure to cite country-conditions

evidence may well have signaled a legal error: that it did not believe that the country conditions mattered. *See K.H.*, 920 F.3d at 476. Or perhaps not. The Board may have followed the correct law but thought that the immigrant-specific evidence overcame everything else. A remand permitted it to clarify the basis for its decision, *see Zometa-Orellana*, 19 F.4th at 979, which would allow us to provide "meaningful" substantial-evidence review after that clarification, *Dep't of Com.*, 139 S. Ct. at 2573; *see also Zuniga-Martinez*, 2022 WL 2160668, at *5–6. But we see no need for this type of clarification in this case. The Board's grounds for decision are clear, and there is no reasonable basis for concluding that the Board may have committed a legal error.

2. *Substantive Error*. The Board's finding that Iris and Jose failed to show that the Salvadoran government was unable to control the MS-13 gang survives our deferential substantial-evidence review, even after we account for the country-condition reports. Admittedly, these reports paint a stark picture of gang violence. When combined with Iris and Jose's individual circumstances, therefore, they may well have *permitted* the Board to conclude that the government was unable to protect them. But nothing in the record *compelled* that finding—the standard that Iris and Jose must meet to obtain judicial relief. 8 U.S.C. § 1252(b)(4)(B); *see Elias-Zacarias*, 502 U.S. at 481 & n.1.

This standard is not just deferential; it is "highly" so. *Ming Dai*, 141 S. Ct. at 1677 (quoting *Nasrallah v. Barr*, 140 S. Ct. 1683, 1692 (2020)). To put things in perspective, our court has said that we may not reverse a district court's factual finding under the deferential clear-error standard of review that applies to *judicial* findings unless it "strike[s] us as wrong with the force of a five-week-old, unrefrigerated dead fish." *Taglieri v. Monasky*, 907 F.3d 404, 409 (6th Cir. 2018) (en banc) (citation omitted), *aff'd* 140 S. Ct. 719 (2020). And the Supreme Court has described this clear-error standard as a more searching review than the substantial-evidence standard that we must apply in this *agency* context. *See Dickinson v. Zurko*, 527 U.S. 150, 153 (1999).

Our recent decision in *Rosa-Mejia* shows how deferential this test is. There, gang members had extorted the son of a Salvadoran woman, Maria Cristina Rosa-Mejia, so he fled to the United States. 854 F. App'x at 10. The gang members then directed their extortion against

Maria. *Id.* But she refused to pay their demands and moved to a different part of El Salvador. *Id.* at 11. A month after she refused to pay, gang members shot up her home. *Id.* at 11. She escaped with her other son during this shooting, but her husband fell behind. *Id.* She returned with the police to find that her husband had been murdered. *Id.* How did the police help? They "instructed [her and her son] to pack her things and never return," and she did not speak with them again. *Id.* Like Iris and Jose in this case, Maria (and her other son) argued that corruption in El Salvador "would prevent them from seeking protection from the police." *Id.* at 13. But the immigration judge (and the Board) denied their claims, finding, among other things, that the Salvadoran police were not unable or unwilling to control the gangs. *Id.* at 13–14. The agency relied on the fact that Maria had not immediately called the police after first receiving the extortion demands, that the police had offered minimum help after the shooting, and that El Salvador's "government had taken recent steps to curb gang violence amongst the police, including establishing a new internal investigative office and removing 600 members with gang ties from its ranks." *Id.* at 14. We upheld its finding "[g]iven the great deference" that the statute required us to provide. *Id.*

If anything, *Rosa-Mejia* is the harder case. Unlike Maria, who eventually asked for police aid, Iris and Jose never alerted the police about the extortion. A.R. 4. So the intuition that "no government can protect its citizens from activities it is not made aware of" applies more forcefully in this case than it did in *Rosa-Mejia*. 854 F. App'x at 14 (citation omitted); *see Seye*, 768 F. App'x at 383. And the police aid that Maria received after her husband's murder does not distinguish her case in a way that helps Iris and Jose. The police told her to leave and never come back. *Rosa-Mejia*, 854 F. App'x at 11. Those specific facts show more of a law-enforcement inability to control criminals than the specific facts in this case: successful police aid in controlling Jose's uncle and daily police raids to control the gangs in the town in which Iris and Jose lived. A.R. 5. As for El Salvador's general conditions, this case includes a State Department report that has the very same statistic on which we relied in *Rosa-Mejia*. It discusses the government's creation of the "internal investigative office" to combat police corruption and the government's removal of some "660 soldiers from [the army's] ranks due to alleged ties to gang members." A.R. 340. If this report allowed the Board to conclude that the government was

taking steps to control gang violence in *Rosa-Mejia*, it necessarily allowed the Board to make the same finding in this case.

True, it is reasonable to view the evidence differently. Iris and Jose argue that they did not alert the police because of a fear that the gangs would retaliate against them—a fear objectively corroborated by the country-condition reports. And the willingness of the police to intervene in domestic disputes may not say much about their willingness to intervene in gang-related disputes. But we do not serve as the finder of fact. Under § 1252(b)(4)(B), we cannot reverse the agency's finding simply because we might have come out the other way. *See Khalili*, 557 F.3d at 435.

Nor is this case anything like the one on which Iris and Jose rely: *Juan Antonio*. The immigrant in that case had repeatedly gone to the police about her abusive spouse, who consistently raped and beat her and threatened to kill her. *See Juan Antonio*, 959 F.3d at 784–86. As a matter of law, therefore, *Juan Antonio* did not adopt legal rules to govern cases like this one in which immigrants fail to alert the police of private crimes. Our cases have also repeatedly relied on an immigrant's failure to do so as a factor in favor of denying relief. *See Ortiz*, 6 F.4th at 690.

In addition, the Board in *Juan Antonio* held that a restraining order issued against the abusive spouse, along with the immigrant's ability to live peacefully away from this spouse for a year, showed that the Guatemalan government could control him. 959 F.3d at 794. As a matter of fact, we found that substantial evidence did not support these findings. Undisputed evidence showed that the spouse flouted the restraining order, including by beating his oldest child. *Id.* And the year of "peaceful" living had been filled with death threats. *Id.* In this case, by contrast, the Board did not commit a similar factual error. Iris and Jose point to no *ancillary* factual findings that the Board botched. Rather, they challenge only the Board's *ultimate* factual finding that the Salvadoran government could protect them. For the reasons we have already explained, substantial evidence supported that ultimate finding.

* * *

In sum, the Board did not commit a legal error in interpreting and applying the asylum and withholding-of-removal statutes. Its opinion also allows us to discern the grounds on which it relied. And its findings have a fair evidentiary basis. We thus must deny the petition for review.

––––––––––––––––––

**DISSENT**

––––––––––––––––––

CLAY, Circuit Judge, dissenting.   Petitioners Iris Lisseth Rodriguez de Palucho, Jose Miguel de Palucho Lara, and their two minor children (collectively "Petitioners") ask this Court to review a Board of Immigration Appeals' ("BIA") decision denying their applications for asylum and withholding of removal under the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1158, 1231(b)(3).   Because the BIA both procedurally and substantively erred when it denied the family's applications, I respectfully dissent.

## I.  BACKGROUND

Petitioners are citizens of El Salvador.   Jose and Iris ran a small shop and a mill in El Salvador.   After several run-ins with the MS-13 gang, the family fled to the United States.   In their asylum applications, Jose and Iris said that they were afraid to return because they believed that the MS-13 gang would harm or kill them.

Jose described four instances of gang-related extortion and crime against him.   First, in May 2016, Jose got a phone call from a member of the MS-13 gang.   The caller told him to pay $800 or else the gang would kill him and his family.   The person kept calling over the next two days, demanding money.   Jose paid what he could and wired $200 to the caller.[1]   After that, the caller said that the gang would leave Jose alone.   Second, four MS-13 gang members robbed Jose while he was working about thirty minutes away from his home.   Third, while traveling with a co-worker in the same area, Jose was again approached by MS-13 members.   This time the gang members were armed, and they threatened to kill Jose for entering gang territory.   But they let him go after the co-worker called his cousin, who was a gang member himself, and the cousin vouched for the two men.   Finally, MS-13, which controls the area where the family lived, began charging Jose "rent" to run his business.   In September 2016, MS-13 threatened to kill him and his family if he did not pay.   At first, Jose paid MS-13.

––––––––––

[1]Originally, the caller told Jose to meet him at a park in front of the mayor's office in Usulutan.   The mayor was arrested the next year for having ties to the MS-13 gang.

Eventually he stopped paying the extortion money and fled the country with his eldest son. After he left, MS-13 began extorting Iris, threatening to kill her and their younger son if she did not pay the gang. On August 1, 2017, Iris was working at the mill when a boy on a motorbike came to the shop and asked for her by name. The boy told Iris that he was with the MS-13 gang, and he told her that she had to start paying a $100 monthly "rent" to the gang or else they would kill her and her son. She paid the boy, but he came back at the end of that month and demanded more money. Again, Iris paid the MS-13 member. She then sold the mill, moved out of her house, and fled El Salvador a few weeks later.

Neither Jose nor Iris reported any of these gang encounters to the police. Jose testified that he did not report the incidents "[b]ecause if you do, [MS-13] will find out and they will kill you." (Hr'g Tr., A.R. #160.) In their asylum applications, Jose and Iris said that "[m]any police [in El Salvador] are involved with MS-13." (Asylum Appl., A.R. #515, #741.) Jose testified that, "within the police, there are good people but there are also people that are camouflaged, undercover there and work with [gangs]." (Hr'g Tr., A.R. #160.) In her credible fear interview, Iris recalled one incident where police assassinated three civilians who had problems with the gang.

Jose had called the police for help with non-gang related crimes, specifically to report a domestic dispute during which his uncle threatened to kill him. The police issued a restraining order against his uncle and came by the family's house every now and then to make sure things were okay. MS-13 members, seeing the police coming and going, came to the house and asked Jose if he "was providing information about them." (*Id.* at A.R. #162.) They told Jose that they would kill him if it turned out that he had been giving information to the police. Jose explained his decision to call the police about his uncle, but not the gang threats, saying:

> [T]he problem with [his] uncle, even though it was a big problem, it was just a matter of family. But with [MS-13], if you do something like that, you are giving away your life. They are going to kill you.

(*Id.* at A.R. #163.) Iris said that, even though they got help with Jose's uncle, they would not call the police about the gang problems because "no[] one goes to the police" for gang issues. (Credible Fear Interview, A.R. #282.) These fears were echoed by Petitioners' family and

friends. Iris' mother said that "sometimes there are policemen who are involved with the gang and leak information." (Rodriguez Decl., A.R. #305–06.) But Jose also testified that he heard "the patrol cars of the police trying to do raids" during gang meetings, and he would hear the gang members running away. (Hr'g Tr., A.R. #171.) He said these raids happened almost every day. Still, he did not report any of MS-13's crimes against him to the police.

According to a 2016 El Salvador country report issued by the United Nations High Commissioner for Refugees (the "UNHCR Report"):

> In general, . . . intimidation and violence against complainants reportedly continues to contribute to a climate of impunity from criminal investigation and prosecution. Victims are particularly averse to reporting crimes perpetrated by gangs for fear of reprisals. For example, a survey indicated that 84 percent of businesses that were subjected to extortion did not lodge a complaint with the police or other authorities due to threats by gangs and the gangs' practice of killing those who do report them to the authorities. Complaints to the police about gang extortion are reportedly often relayed back to the gangs, which then exact severe retribution on the complainants.
>
> It is reported that police — even the elite Anti-Gang Unit in high-profile cases — are usually not seen as offering a sufficient form of protection to those residents who are threatened by gangs, since their presence is only temporary and the gangs will return once the police move on after a few hours or days. Reports indicate that often the most that police are able to do is to provide an escort out of the neighborhoods for those who have received threats.

(2016 UNHCR Rep., A.R. #365, #390.) The UNHCR Report noted that gangs often kill people to ensure their silence, even if the victim never went to the police.

After Petitioners entered the United States, the United States Citizenship and Immigration Services ("USCIS") initiated removal proceedings against them. The family filed applications for asylum and withholding of removal. The immigration judge ("IJ") denied their applications, and the BIA affirmed. The BIA found that the family was unable to meet the requirements for asylum because they had not shown that the Salvadoran government was both unwilling and unable to control MS-13. The family now petitions this Court to review the BIA's decision.

## II.  DISCUSSION

The Attorney General has the authority to grant asylum to those applicants who meet the definition of a "refugee."  8 U.S.C. § 1158(b).  A "refugee" is a person "who is unable or unwilling to return to her home country because of past persecution or a 'well-founded fear' of future persecution 'on account of race, religion, nationality, membership in a particular social group, or political opinion.'"  *Moreno v. Sessions*, 694 F. App'x 391, 395 (6th Cir. 2017) (quoting *Umana-Ramos v. Holder*, 724 F.3d 667, 670 (6th Cir. 2013)).  "An asylum applicant bears the burden of demonstrating that she qualified as a refugee by establishing 'either that [s]he has suffered actual past persecution or that [s]he has a well-founded fear of future persecution.'" *K.H. v. Barr*, 920 F.3d 470, 475 (6th Cir. 2019) (quoting *Pilica v. Ashcroft*, 388 F.3d 941, 950 (6th Cir. 2004)).    "Persecution is 'the infliction of harm or suffering by the government, or persons the government is unwilling or unable to control, to overcome a characteristic of the victim.'" *Id.* (quoting *Kamar v. Sessions*, 875 F.3d 811, 818 (6th Cir. 2017)).

"When an asylum claim focuses on non-governmental conduct, the applicant must show that the alleged persecutor is either aligned with the government or that the government is unwilling or unable to control him." *Juan Antonio v. Barr*, 959 F.3d 778, 793 (6th Cir. 2020) (citing *Khalili v. Holder*, 557 F.3d 429, 436 (6th Cir. 2009)).  "An applicant meets this burden when she shows that she cannot 'reasonably expect the assistance of the government' in controlling her perpetrator's actions." *Id.* (citing *Al-Ghorbani v. Holder*, 585 F.3d 980, 998 (6th Cir. 2009)).  When evaluating the "unwilling or unable" requirement, courts "must examine 'the overall context of the applicant's situation,'"  *K.H.*, 920 F.3d at 475 (quoting *Haider v. Holder*, 595 F.3d 276, 287 (6th Cir. 2010)), and they must review "all relevant evidence in the record," *id.* (quoting *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1069 (9th Cir. 2017)).

In *K.H.*, this Court articulated the test for the "unable or unwilling" requirement. *See K.H.*, 920 F.3d at 476.  To determine whether a government is unwilling or unable to help an asylum applicant, this Court "look[s] to two general categories of information:  (1) the government's response to an asylum applicant's persecution and (2) general evidence of country conditions." *Id.* (citing *Perez-Aguilon v. Lynch*, 674 F. App'x 457, 463 (6th Cir. 2016)).  As to the first prong, the government's response, courts should look at factors including:  "(1) whether

the police investigated, prosecuted, and punished the persecutors; (2) the degree of protection offered to an asylum applicant following the persecution; and (3) any concession on the part of the government" admitting that they cannot control the persecutor. *Id.* at 476–77 (internal citations omitted) (citing *Berishaj v. Gonzales*, 238 F. App'x 57, 63–64 (6th Cir. 2007); *Khalili*, 557 F.3d at 436; *Garcia v. Atty. Gen. of the U.S.*, 665 F.3d 496, 503 (3d Cir. 2012)). And on the second prong, country conditions, IJs should consider: "(1) how certain crimes are prosecuted and punished; [and] (2) the efficacy of the government's efforts." *Id.* at 477–78 (internal citations omitted) (citing *Kamar*, 875 F.3d at 819; *El Ghorbi v. Mukasey*, 281 F. App'x 514, 517 (6th Cir. 2008)).

In this case, the IJ found that Petitioners had not met their burden to show that the Salvadoran government was unable or unwilling to control MS-13. It pointed to three pieces of evidence to support this conclusion. *First*, it noted that the police had helped Jose handle his disputes with his uncle in the past. *Second*, Jose testified that the police raided the neighborhood looking for gang members almost every day, which, according to the IJ, "show[ed] that the government of El Salvador is making steps and is willing to make attempts to protect members of the neighborhood and society from gang members." (IJ Dec., A.R. #107.) *Third*, it found "that while some officials may be corrupt . . . such as the mayor of the town in which they live, there is no evidence that the mayor of the town was involved in the extortion of Jose." (*Id.*) Aside from a passing citation in the Background section, the IJ did not reference any of the general country conditions evidence such as the UNHCR Report.

On appeal, the BIA agreed with the IJ's reasoning. It summarized the IJ's findings, focusing on the findings that the police had helped Jose manage his uncle and that Jose admitted that the police regularly raided the neighborhood looking for gang members. It also noted that Petitioners had not reported any of the MS-13 incidents to the police. Citing this Court's opinion in *Reyes Almendarez v. Barr*, 817 F. App'x 35, 41 (6th Cir. 2020), the BIA found that Petitioners' decisions not to follow up with the police undermined their argument that the police were unable or unwilling to control MS-13. According to the BIA, the IJ "acknowledged El Salvador's problems with gang members and the evidence of corruption of some officials." (BIA Dec., A.R. #4 (citing IJ Dec., at A.R. #107).) The BIA did not claim to have independently

assessed the general country conditions evidence. Much like the IJ, the BIA did not cite to the country conditions evidence in the record. It only cited the record four times, and only in reference to Iris' and Jose's own declarations and testimony.

On appeal, Petitioners first argue that the BIA "failed to consider evidence of country conditions." (Pet'rs' Br. at 9.) "When . . . the BIA[] does not make the proper inquiry and legal conclusions, supported by legal analysis and reasoning, the 'proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Mapouya v. Gonzales*, 487 F.3d 396, 405 (6th Cir. 2007) (quoting *Gonzales v. Thomas*, 547 U.S. 183 (2006) (per curiam)). After citing the two-prong test from *K.H.*, the BIA failed to sufficiently address the second prong, general country conditions. Under *K.H.*, IJs and the BIA must consider country conditions to determine "how certain crimes are prosecuted and punished" and "the efficacy of the government's efforts." *K.H.*, 920 F.3d at 477–78. But, in its opinion, the BIA did not independently analyze the record to address these issues, nor did it cite any of the record evidence on country conditions. It merely noted that the IJ had "acknowledged El Salvador's problems with gang members and the evidence of corruption in some officials," and "found that the government in El Salvador is taking steps to protect its citizens from gang members." (*Id.* at A.R. #4–5.) As scant support for this sweeping conclusion, the BIA cited portions of the IJ decision that, in turn, did not cite the country condition evidence or engage in any analysis of the Salvadoran government's willingness or ability to prevent gang violence and hold MS-13 members accountable for crimes like extortion. *See Reyes*, 817 F. App'x at 41 (finding IJ sufficiently considered country conditions when it cited to and discussed the Department of State Human Rights Report for Honduras). Thus, the BIA's reliance on the IJ's bareboned analysis was misplaced. Because the BIA failed to "make a proper inquiry" into the country conditions, as required under *K.H.*, it committed a reversible error. *See K.H.*, 920 F.3d at 478.

While admitting that the BIA did not cite the country conditions evidence, the majority forgives this oversight by saying that it is not this Court's place to determine "best practices" in relation to the BIA's "opinion-writing" skills. (Maj. Opn. at 9–10.) It relies on the general principle that the BIA and lower courts do not need to cite every piece of evidence to avoid

committing procedural error. However, whether the BIA properly considered evidence of country conditions is more than a quibble over "best practices," nor is this a case where the BIA merely omitted references to evidence of nominal significance. As we explained in *Saleh v. Barr*—on which the majority relies to defend the BIA's perfunctory opinion—"[f]actual errors can qualify as legal errors when 'important facts have been *totally overlooked*.'" 795 F. App'x 410, 418 (6th Cir. 2019) (quoting *Shabo v. Sessions*, 892 F.3d 237, 239–40 (6th Cir. 2018)) (emphasis in original). Certainly, evidence of general country conditions inherently includes "important facts," *id.*, given that this Court has said the BIA *must* analyze this kind of evidence, *K.H.*, 920 F.3d at 476.

In this case, the BIA did not cite the country conditions evidence, nor did it engage in any substantive discussion of the contents of those reports. All the BIA said was that the Salvadoran government was "taking steps" to combat gang violence. (BIA Dec., A.R. #5.) But what steps did the BIA believe were sufficient to show that the government could control MS-13? Were these efforts working? The BIA did not explain. While counseling that this Court must limit its review to the reasons the BIA gave and must not rely "on a rationale that the court comes up with after the fact," (Maj. Opn. at 9), the majority fails to follow its own guidance. Indeed, it relies on precisely this kind of *post hoc* justification. It points to evidence of El Salvador's "Internal Investigative Office" as evidence that the government can control gang activity. (*Id.* at 12–13.) Yet this rationale is nowhere to be found in the BIA's skeletal opinion. The majority covers up this procedural blunder by concocting a new justification for the BIA's decision far beyond those articulated by the agency. In fact, the BIA only pointed to specific evidence of Petitioners' circumstances to the exclusion of the background evidence concerning *general* country conditions. This defies this Court's instruction that "a government's specific response to a petitioner's persecution *cannot be the only relevant evidence* an immigration judge considers." *K.H.*, 920 F.3d at 476 (emphasis added). This procedural error alone warrants reversal. *Mapouya*, 487 F.3d at 405 (quoting *Gonzales*, 547 U.S. at 183).

A proper review of the full record—including general country conditions—compels the conclusion that Petitioners cannot "'reasonably expect the assistance of the government' in controlling" the MS-13 gang. *Juan Antonio*, 959 F.3d at 794 (quoting *Al-Ghorbani*, 585 F.3d at

998). Therefore, the BIA's decision was not supported by substantial evidence. *See id.* As to *K.H.*'s first prong, "the government's response to an asylum applicant's persecution," 920 F.3d at 476 (citing *Perez-Aguilon*, 674 F. App'x at 463), Respondent argues that Petitioners' asylum application fails because they never sought help from the police for gang-related crime. (*See* Resp. Br. at 14 (arguing that asylum applications fail "[w]ithout some evidence that Petitioners actually called on the police and did not receive the protection they were entitled to").) But such a bright line rule is inconsistent with *K.H.*'s two-prong analysis, which makes clear that the "unable and unwilling" analysis cannot rise and fall on the first prong alone. *K.H.*, 920 F.3d at 476. There is some record evidence indicating that the Salvadoran government was willing to control MS-13—particularly the gang raids in Petitioners' neighborhood. And the police did intervene in Jose's domestic dispute with his uncle (though that was not a gang-related incident). These facts would indicate that El Salvador had *some* willingness to combat crime in general— including gang-related crime. That was the BIA's logic. But the inquiry does not (and cannot) stop there. In this case, the country conditions evidence overwhelmingly shows that the Salvadoran government was nonetheless *unable* to control MS-13.

Under the second prong of *K.H.*, which looks at "general evidence of country conditions," the record contradicts the BIA's finding that "the government in El Salvador is taking steps to protect its citizens from gang violence." (BIA Dec., A.R. #5.) *First*, the UNHCR Report indicates that even regular gang raids do not demonstrate the Salvadoran government's *ability* to control MS-13. It found that "police — even the elite Anti-Gang Unite in high-profile cases — are usually not seen as offering a sufficient form of protection . . . since their presence is only temporary and the gangs will return once the police move on after a few hours or days." (2016 UNHCR Rep., A.R. #390); *see also Juan Antonio*, 959 F.3d at 786 (noting that UNHCR reports are reputable sources for country conditions).

Second, the country conditions show that police intervention in non-gang related crime hardly shows the government's ability to control MS-13. Even if the police were willing to intervene in domestic disputes, like with Jose's uncle, that bears little weight when determining whether the government could control *gang* activity. Not only does the UNHCR Report undermine the BIA's reasoning, but it also shows that gangs in El Salvador had infiltrated police

and military units.   Shortly after Petitioners fled El Salvador, the mayor of their town was convicted for having ties to gangs.**2**   And there were reports of police officers killing civilians who created problems for MS-13 members.

Finally, the country conditions corroborate Petitioners' statements that they did not file police reports because they feared gang retaliation.   Asylum applicants are not required to go to the police in their home country if doing so would be dangerous or futile.   *See Juan Antonio*, 959 F.3d at 793 (citing *In re S-A-*, 22 I. & N. Dec. 1328, 1333, 1335 (B.I.A. 2000)).   The majority points to a slew of unpublished and out-of-circuit opinions for the proposition that it is exceedingly difficult for petitioners to satisfy the willing and able showing if they never sought assistance from the police in their home country.   (*See* Maj. Opn. at 7 (citing *Seye v. Barr*, 768 F. App'x 381, 383 (6th Cir. 2019); *Ralios Morente v. Holder*, 401 F. App'x 17, 24 (6th Cir. 2010); *Sanchez-Amador v. Garland*, 30 F.4th 529, 534 (5th Cir. 2022)).)   But these citations are a thinly veiled attempt to circumnavigate this Court's binding precedents establishing that failure to report non-state persecution to the police can, in fact, be further evidence of the government's inability to control gang violence.   At the very least, this fact does not preclude asylum.

Although paying lip service to this Court's binding opinion in *Juan Antonio*, the majority utterly fails to apply the standard set out in that case.   As this Court explained in *Juan Antonio*, failure to go to police does not affect asylum eligibility if the petitioners have shown that they cannot "reasonably expect the assistance of the government." *Juan Antonio*, 959 F.3d at 793. According to the majority, as long as the BIA uses certain magic words in its opinion— specifically, that the home country has "tak[en] steps" to deter gang activity—then the BIA is not required to point to any specific evidence to support this finding, nor does it need to follow *Juan Antonio*'s instruction to assess whether the petitioner could reasonably expect assistance.   But the legal analysis set forth in *Juan Antonio* is binding on this panel.   *See Salmi v. Sec'y of Health & Hum. Servs.*, 774 F.2d 685, 689 (6th Cir. 1985).   A proper application of this legal framework

---

**2**Petitioners do not allege that the mayor was involved in extorting them, though there is some circumstantial evidence to that effect.   Whether or not the mayor was somehow involved in extorting Petitioners, this fact is relevant to the overall context because it shows that the gangs are deeply embedded in authoritarian structures in El Salvador.

compels the conclusion that Petitioners reasonably refused to go to the police because they feared gang retaliation.

The country conditions reports *corroborate* Petitioners' fear of reporting MS-13 to the police. The UNHCR Report found that, "[c]omplaints to the police about gang extortion are reportedly often relayed back to the gangs, which then exact severe retribution on the complainants." (2016 UNHCR Rep., A.R. #390.) Gangs in El Salvador often kill victims who go to the police. Indeed, the Report noted that gangs often kill victims to ensure their silence, even if the victim never went to the police. Fear of gang retribution is so widespread that only 16% of the population is willing to report gang extortion. Thus, the country conditions evidence shows that any attempt to seek police assistance likely would have been futile at best and lethal at worst.

In this case, Petitioners' experiences were entirely consistent with the country conditions evidence showing that the Salvadoran government is unable to control gang members. Even though the police may have occasionally made some effort to interrupt gang activities (*i.e.*, gang raids), that does not necessarily mean that the Salvadoran government was *able* to control MS-13 related crime. *Juan Antonio*, 920 F.3d at 793 (finding that the government's actions "may indicate some willingness . . . to control [the persecutor] but it does not indicate its ability to do so"). Whether or not the government is *willing* to control gang members, the record is replete with evidence showing that the police were *unable* to control them, *see id.* at 794, as demonstrated by MS-13's routine practice of killing victims who filed police complaints. After reviewing "the overall context" of Petitioners' asylum application, *K.H.*, 920 F.3d at 476 (quoting *Haider*, 595 F.3d at 287), "the record compels the conclusion that [Petitioners] cannot 'reasonably expect the assistance of the government' in controlling" the MS-13 gang, *Juan Antonio*, 959 F.3d at 794 (quoting *Al-Ghorbani*, 585 F.3d at 998). Accordingly, the BIA erred in denying Petitioners' applications for asylum and withholding of removal on this basis.

## III. CONCLUSION

For these reasons, I would grant the petition for review.