NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0146n.06

Case No. 25-3472

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Mar 20, 2026
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| OSCAR RIVERA-GAONA, | ) | |
| Petitioner, | ) | |
|  | ) | ON PETITION FOR REVIEW |
| v. | ) | FROM THE UNITED STATES |
|  | ) | BOARD OF IMMIGRATION |
| PAMELA BONDI, Attorney General, | ) | APPEALS |
| Respondent. | ) | |
|  | ) | OPINION |
| | ) | |

Before: BATCHELDER, THAPAR, and MATHIS, Circuit Judges.

**ALICE M. BATCHELDER, Circuit Judge.** Petitioner Oscar Rivera-Gaona, a Mexican citizen who overstayed his temporary agricultural worker visa in 2007, was detained by the Department of Homeland Security in 2017. After conceding removability under the Immigration and Nationality Act (INA), he applied for asylum under section 208(b)(1) of the INA, 8 U.S.C. § 1158(b)(1), withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. § 1231(b)(3), and withholding of removal under Article III of the Convention Against Torture (CAT), *see* 8 C.F.R. § 1208.16(c). An Immigration Judge denied his application, and the Board of Immigration Appeals summarily affirmed. Because we lack jurisdiction to review Rivera-Gaona's asylum claim, and because substantial evidence supports the denial of the remaining relief, we **DENY** his petition for review.

**I.**

Rivera-Gaona is a Mexican citizen from the city of Puebla. In 2007, he entered the United States pursuant to a temporary agricultural worker visa. When that visa expired after 129 days, he

remained in the United States without authorization. In 2017, Rivera-Gaona was served a Notice to Appear charging him with removability. Rivera-Gaona conceded removability. In 2018—over a decade after his initial arrival in the United States—he applied for asylum, withholding of removal, and relief under CAT.

Rivera-Gaona claims he is entitled to this relief because of a decades-old inter-familial dispute that allegedly plagues him to this day. According to Rivera-Gaona, in 2004, he was drinking beer in a store in his Mexican hometown when his neighbor, Angel (or Anjel) Aguilar-Montero, arrived. Aguilar, who had also been drinking, confronted Rivera-Gaona over a woman whom Rivera-Gaona had dated in the past and on whom Aguilar apparently had designs. Despite Rivera-Gaona's protests that he "didn't have anything to do with her anymore," Aguilar purportedly shoved Rivera-Gaona. Rivera-Gaona punched Aguilar in response, knocking out his tooth. Aguilar was taken to the hospital, and Rivera-Gaona paid Aguilar's family 2,000 pesos to cover his medical bills.

This concession apparently did not satisfy the wounded Aguilar, and he sued Rivera-Gaona for 10,000 pesos. Aguilar also filed a criminal complaint with the police. Luckily for Rivera-Gaona, Aguilar failed to appear in court and later left for the United States. Aguilar returned to Mexico in 2006 and allegedly arranged for Rivera-Gaona to be arrested by plainclothes police officers in an unmarked vehicle at the same store where the saga began. Rivera-Gaona says that this was because Aguilar had sued him a second time, implying a civil suit. But Rivera-Gaona also bolsters his narrative with a letter from his attorney, and that letter describes a criminal prosecution. Regardless of whether Rivera-Gaona faced criminal charges, a civil suit, or both, he claims to have been released on bond after three days in jail, and he ultimately prevailed at trial.

Aguilar and his mother also allegedly made verbal threats against Rivera-Gaona, his parents, and his brother relating to the 2004 incident. Rivera-Gaona gave unclear testimony as to the number of times he and his family members were threatened, but the thrust of these threats was that Rivera-Gaona would be put in prison or beaten if he did not provide Aguilar with 10,000 pesos. Neither Rivera-Gaona nor his family have received any threats from Aguilar or his family since Rivera-Gaona came to the United States in 2007. In fact, Rivera-Gaona identifies only one instance of his or his family's hearing of Aguilar's apparently festering anger. About three months prior to Rivera-Gaona's asylum hearing, "[his] father heard that [Aguilar's] friend . . . said that [Aguilar] was just . . . waiting for [Rivera-Gaona] to arrive to hurt [him]." Allegedly out of fear of Aguilar—who "has lots of family, relatives, and friends" and whose "family is kind of like a part of the secretary of the government"—Rivera-Gaona never reported these incidents to the local police. Nor did he tell anyone at the embassy where he secured his visa. According to Rivera-Gaona, people are often killed in these kinds of inter-familial feuds and the Mexican government "covers these things up." Rivera-Gaona does not allege any past physical injury to himself or his family.

Despite learning about the asylum process within a few years of his arrival, Rivera-Gaona never sought asylum during his first decade in the United States "[b]ecause [he] didn't think that [he] was going to have a problem here." He only did so when he was detained in 2017. Rivera-Gaona contends he cannot live safely anywhere in Mexico because Aguilar has "lots of family, relatives, and friends" "with a lot of influence." Rivera-Gaona also says that he is "afraid of going back to Mexico because it's not easy" to do so after being in the United States "for too long."

The Immigration Judge (IJ) denied his asylum, withholding-of-removal, and CAT-relief requests. The Board of Immigration Appeals (BIA) summarily affirmed that decision pursuant to

3

8 C.F.R. § 1003.1(e)(4). Rivera-Gaona brings this petition for review, alleging erroneous denial of his application and deprivation of due process.

## II.

"When the [BIA] adopts the decision of the IJ in lieu of issuing its own opinion, we review the IJ's decision as the final agency decision." *Denko v. I.N.S.*, 351 F.3d 717, 726 (6th Cir. 2003). "We review the BIA's factual findings under the substantial evidence standard and treat them as 'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Seldon v. Garland*, 120 F.4th 527, 531 (6th Cir. 2024) (citation omitted); *see also* 8 U.S.C. § 1252(b)(4)(B). We review legal conclusions de novo. *Seldon*, 120 F.4th at 531.

## A.

Rivera-Gaona first contends that the BIA's summary affirmance of the IJ's decision deprived him of due process. Specifically, Rivera-Gaona asks us to reverse the BIA's decision because it fails to explicitly adopt the IJ's reasoning and fails to expressly address the arguments raised by Rivera-Gaona before the BIA. But the BIA did adopt the IJ's decision when it issued its summary affirmance, declaring that "[t]he decision below is, therefore, the final agency determination." *See* 8 C.F.R. § 1003.1(e)(4)(ii) (instituting this language for BIA summary affirmance). And we have held that "it is not 'a due process violation for the BIA to affirm the IJ's decision without issuing an opinion.'" *Denko*, 351 F.3d at 730 (citation omitted). And Rivera-Gaona's argument defies logic when he suggests that the BIA conceded the merits of his arguments when it did not issue an opinion. "[A] summary affirmance can be issued only when 'the [BIA] Member determines that the result reached in the decision under review was correct.'" *Id.* at 729 (quoting 8 C.F.R. § 1003.1(a)(7)). By summarily affirming the IJ's decision, the BIA necessarily rejected Rivera-Gaona's arguments against it either because those arguments lacked merit or

4

because they merely identified "errors in the IJ's decision [that we]re harmless or nonmaterial." *Id.* Rivera-Gaona's "due process rights [we]re not violated simply because the BIA did not issue a reasoned explanation." *See id.* at 730.

## B.

Turning to Rivera-Gaona's request for asylum, we hold that we lack jurisdiction to review his untimely application. Applications for asylum must be "filed within 1 year after the date of the alien's arrival in the United States." 8 U.S.C. § 1158(a)(2)(B). Rivera-Gaona filed his application over a decade late. Untimely applications "may be considered . . . if the alien demonstrates to the satisfaction of the Attorney General either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application within the [one year deadline]." *Id.* § 1158(a)(2)(D). But Rivera-Gaona offers no "extraordinary circumstances," and the IJ determined that his purported "changed circumstances" did not meet the statutory standard. Because such determinations are discretionary, that is, that the alien has shown "to the satisfaction of the Attorney General" that his circumstances meet the statutory standard, we lack jurisdiction to review them. *See Osabas-Rivera v. Bondi*, 161 F.4th 446, 452–54 (6th Cir. 2025).

## C.

The IJ identified multiple fatal flaws in Rivera-Gaona's withholding-of-removal application. One suffices for our review. "To establish persecution in a claim for withholding of removal, an applicant must show that his feared harm was inflicted either by the government or by private parties that the government is unable or unwilling to control." *Osabas-Rivera*, 161 F.4th at 455 (citation modified). This Court has identified two standards by which an alien may make this showing:

5

> Some of our cases have noted that immigrants must show that they cannot "reasonably expect the assistance of the government" in deterring the criminal actor. Others have noted that the government must have either "condoned" the private violence "or at least demonstrated a complete helplessness to protect the victims." (Some courts have suggested that these standards are functionally identical.)

*Palucho v. Garland*, 49 F.4th 532, 536 (6th Cir. 2022) (citations omitted). Whichever standard applies, the IJ "must consider the totality of the circumstances . . . includ[ing] both specific evidence about the government's response to the crimes inflicted on an immigrant and general evidence about a country's ability to deter those crimes." *Id.* (citations omitted). And on review, we apply the substantial-evidence standard to its determination that an applicant's circumstances do not qualify as persecution. *Urias-Orellana v. Bondi*, 607 U.S. ---, 2026 WL 598435, at *2 (U.S. Mar. 4, 2026).

Rivera-Gaona fails to satisfy either standard identified in *Palucho* (assuming they are not the same standard). He contends that the government is unable or unwilling to protect him from Aguilar and his family. By way of evidence, his brief before this Court generally points to his and his family's "experiences" and suggests that they are "corroborated" by various country reports on Mexico. The IJ considered both Rivera-Gaona's "specific evidence" and the "general evidence" about Mexico's ability to deter crime. *See Palucho*, 49 F.4th at 536. But as the IJ recognized, this evidence fails to support Rivera-Gaona's argument at best and undermines it at worst.

First, Rivera-Gaona admits that he never went to the police or anyone else in the government to report the threats from Aguilar and his family. "[A]n immigrant's failure to report crimes to the police will make it more difficult to show that the government was unable or unwilling to control the criminals." *Palucho*, 49 F.4th at 537 (citation omitted). Rivera-Gaona, relying on our decision in *Juan Antonio v. Barr*, 959 F.3d 778, 788 (6th Cir. 2020), counters that contacting the police would have been futile or dangerous because Aguilar "has people in the

6

government." But the IJ, also citing to *Juan Antonio*, concluded that Rivera-Gaona failed to establish such futility or danger, and substantial evidence supports this conclusion. Beyond a threadbare assertion that Aguilar's family "is kind of like a part of the secretary of the government over there," Rivera-Gaona fails to establish that these ostensibly powerful officials were connected in any way to Rivera-Gaona's arrest or the threats made by Aguilar and Aguilar's mother. He fails even to identify Aguilar's familial connection to these unnamed individuals. Nor does he explain how "some remote family members would have powerful enough positions to be able to harm [him]." He also provides no specific information concerning the Puebla police force, further precluding an evaluation of any purported corruption. This is a far cry from our conclusion in *Juan Antonio* that, in light of an alien's repeated but fruitless efforts to report violence to the police, the alien need not "wait until she is dead to show her government's inability to control her perpetrator." 959 F.3d at 794.

Second, Rivera-Gaona *won* his 2006 trial relating to the Aguilar affair, belying his assertion that the Mexican government is unwilling or unable to control Aguilar. And though he asserts that his pre-trial arrest was at the hands of plainclothes police officers in an unmarked vehicle, Rivera-Gaona does not allege that the arrest was unlawful. Rather, he merely contends that "in Mexico, it's not normal to take somebody to prison for that type of crime unless it's a bigger crime." And the supposed connection between this purportedly unusual arrest and Aguilar's powerful connections is merely speculation by Rivera-Gaona's mother. Further deflating his argument is the fact that Rivera-Gaona was released after just three days in jail as soon as his attorney posted bond. Far from demonstrating the government's unwillingness or inability to control Aguilar or his family, Rivera-Gaona's testimony indicates the opposite.

7

Third, Rivera-Gaona's reliance on the country reports is unavailing. In his brief before this court, he merely asserts without citation that the U.S. Department of State Human Rights Report on Mexico "show[s] the Mexican government's pervasive inability or unwillingness to control powerful criminal actors." By way of specifics, Rivera-Gaona only identifies the threats faced by "civil society actors," "journalists," "human rights defenders," and those suffering at the hands of "organized criminal violence." But Rivera-Gaona does not claim membership in any of these groups. And as the IJ found, the country reports also establish that the Mexican government is actively working to fight corruption. *See Ortiz v. Garland*, 6 F.4th 685, 690 (6th Cir. 2021) (holding that the BIA may consider a country's efforts to combat any alleged unwillingness or inability to enforce the law). Finally, Rivera-Gaona is incorrect in asserting that the IJ engaged in "speculative or conclusory findings" relating to the country reports. On the contrary, the IJ explicitly took notice of these reports as evidence of general corruption but found that Rivera-Gaona's experience with the country's legal system demonstrates no such corruption in his case. The IJ's decision to deny withholding of removal is supported by substantial evidence.

**D.**

The IJ's denial of CAT relief is likewise supported by substantial evidence. To qualify for CAT protection, Rivera-Gaona "must show that []he would more likely than not be subjected to torture if removed to [Mexico]." *See Vasquez-Rivera v. Garland*, 96 F.4th 903, 911 (6th Cir. 2024) (citation omitted); *see also* 8 C.F.R. § 1208.16(c)(2). "Torture, in this context, means 'any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.'" *Vasquez-Rivera*, 96 F.4th at 911 (citation omitted). For many of the same reasons that she denied his withholding-of-removal

8

request, the IJ ruled that Rivera-Gaona is ineligible for CAT relief because he demonstrated neither a likelihood of harm nor government acquiescence. And as with the withholding-of-removal denial, the CAT-relief denial is supported by substantial evidence.

Rivera-Gaona's buckshot arguments before this Court are unavailing. First, he asserts that the IJ "failed to properly apply the willful blindness standard." But beyond reciting the standard, he makes no attempt at analyzing *how* the IJ failed to apply it. We need not consider this skeletal argument. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997). Second, he contends that "the BIA's reliance on [his] failure to report the beatings to police is misplaced" because he credibly believed such reports would have been futile or dangerous. But Rivera-Gaona's testimony makes no mention of any past "beatings." And to the extent he is referring to his failure to report Aguilar's and Aguilar's mother's threats, Rivera-Gaona's own testimony belies any alleged futility or danger. *See supra*, II.C. Third, he argues that the Mexican government has acquiesced to gang violence and that the government's efforts to fight gang violence does not preclude a finding of acquiescence. But Rivera-Gaona does not allege a likelihood of torture from gang violence, and at any rate the IJ did not rely on Mexico's anti-gang (or even anti-corruption) programs in her CAT analysis. Fourth, he suggests that the IJ misapplied BIA precedent when she supposedly held that "generalized evidence of violence is insufficient." But the IJ made no such conclusion in her CAT analysis; rather, she found that Rivera-Gaona's failure to notify the police of the threats and his success in court deflated his argument that he would likely face torture upon returning to Mexico. And these findings are supported by substantial evidence.

## E.

Finally, Rivera-Gaona argues that the IJ made legal and factual errors which deprived him of due process. Because we lack jurisdiction to review the asylum application and find no legal

9

error or lack of substantial evidence supporting the IJ's remaining conclusions, we hold that Rivera-Gaona was not deprived of due process.

**III.**

For the foregoing reasons, we **DENY** Rivera-Gaona's petition.