NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0111n.06

No. 10-4477

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Jan 31, 2012*

LEONARD GREEN, Clerk

JEAN WYCLIF NDAYISABA,                )
                                      )
        Petitioner,                   )           ON PETITION FOR REVIEW
                                      )           OF A FINAL ORDER OF THE
        v.                            )           BOARD OF IMMIGRATION
                                      )           APPEALS
ERIC H. HOLDER, JR., Attorney General, )
                                      )
        Respondent.                   )
                                      )

BEFORE: MOORE, GRIFFIN, and WHITE, Circuit Judges.

GRIFFIN, Circuit Judge.

Petitioner Jean Wyclif Ndayisaba, a native and citizen of Rwanda, applied for asylum,

withholding of removal, and relief under Article III of the Convention Against Torture ("CAT"),

claiming he would be persecuted at the hands of the Rwandan government on account of his status

as a member of the Hutu tribe and Seventh Day Adventist ("SDA") Church. Ndayisaba testified

before the International Criminal Tribunal for Rwanda ("ICTR")[1] on behalf of a fellow Hutu and

_____

[1]The Fifth Circuit explained the historical origins of the ICTR as follows:

Rwanda has been the source of ongoing ethnic conflict between members of the
majority Hutu and minority Tutsi tribes. In April 1994, President Juvenal
Habyarimana of Rwanda, a Hutu, was killed when his aircraft crashed due to an
artillery attack. The crash triggered a wave of violence by the Hutus against the
Tutsis, which resulted in the deaths of between 500,000 and one-million persons.
Tutsi rebels triumphed over the Hutus, and the Tutsi-dominated government then
requested the U.N. to create an international war crimes tribunal. An investigation
by the U.N. established that the mass exterminations of the Tutsis – motivated by

SDA member accused of genocide. An Immigration Judge ("IJ") determined that Ndayisaba failed to establish his eligibility for relief. The Board of Immigration Appeals ("BIA") dismissed his appeal, and Ndayisaba petitioned us for review. Because the administrative record does not compel a conclusion contrary to the one reached by the IJ and BIA, we deny the petition.

I.

Petitioner Ndayisaba entered the United States on a non-immigrant visitor visa. He remained past his authorized period of stay and later filed an application for asylum, withholding of removal, and relief under CAT, all based upon his fear of being prosecuted, tortured, or killed because he testified before the ICTR on behalf of a fellow Hutu and SDA member on trial for genocide.

The Department of Homeland Security subsequently served Ndayisaba with a Notice to Appear ("NTA"), charging him with removability for remaining in the United States longer than permitted. His application for relief was referred to the Detroit Immigration Court. At his first court appearance, Ndayisaba admitted the factual allegations in the NTA, conceded removability, and renewed his requests for asylum, withholding of removal, and relief under CAT.

At a merits hearing, Ndayisaba offered his testimony and the testimony of former U.S. Attorney General Ramsey Clark. Clark served as counsel for Elizaphan Ntakirutimana, on whose

---

ethnic hatred – had been planned for months. The Security Council adopted Resolution 955, which created the ICTR to prosecute and to punish the individuals responsible for the violations in Rwanda and its neighboring states between January 1 and December 31, 1994.

*Ntakirutimana v. Reno*, 184 F.3d 419, 421-22 (5th Cir. 1999).

behalf Ndayisaba testified before the ICTR. The IJ summarized the testimony and made findings

as follows:

> The respondent is a Rwandan Hutu and a pastor for the Seventh Day Adventist ("SDA") Church. He was born in Kibuye, Rwanda on September 5, 1961. The respondent fears returning to his home country based on his belief that he will be subjected to torture or death because of his status as a Hutu religious leader who testified before the ICTR in support of another Hutu accused of genocide. After surviving the 1994 Rwandan genocide he fled with his wife and daughter to the neighboring Democratic Republic of Congo ("DRC"). After leaving Rwanda, the respondent spent time living and working in DRC, Nigeria, Togo, Burkina Faso, Benin, and Ghana. The respondent's wife and daughter are currently living in Ghana.

> At the end of the 1994 Rwandan genocide, instigated by Hutu rebels, many Hutus fled Rwanda fearing retaliation by Tutsis. The respondent began to fear for his and his family's safety upon learning that a group of Catholic Church bishops were killed in May of 1994. Additionally, he heard reports that Tutsi rebels planned to kill any Hutus they came across and radio broadcasts called for Hutus to surrender or flee. The respondent fled the country to DRC with his family on July 17, 1994.

> While in DRC, the respondent worked for an unaccompanied minors camp being run by the Adventist Development and Relief Agency. In August of 1994, upon hearing that the Rwanda Patriotic Front ("RPF"), the Tutsi led army, had soldiers in the refugee camps, the respondent decided to leave DRC for Nigeria out of fear of what would happen to him if the RPF learned of his presence at the camp. This fear was based on the belief that he would be in danger because he was a high-profile preacher in Rwanda and was well known to the government.

> The respondent and his family resided in Nigeria from October 1995 until December 1996. During this time he was living at the Adventist Seminary of West Africa, Ilishan-Remo, but was unable to acquire humanitarian assistance and was forced to leave when the seminary realized he was not sponsored by the Rwanda Union Mission. The next country the respondent traveled to was Togo, where he lived with his family until June 1997. During this time the respondent was able to volunteer and work. He also obtained some limited financial assistance (US $50) from the United Nations High Commissioner for Refugees ("UNHCR"). The respondent began to fear [for] his safety in Togo after several church members criticized his presence in Togo, and accused him of participating in the 1994 killings. In June of 1997, the respondent left Togo for Burkina Faso.

The respondent lived in Burkina Faso until 2002. While there, the respondent applied for asylum through UNHCR and received provisional refugee status pending [a] determination by the National Commission for Refugees. Also while living in Burkina Faso, the respondent was contacted by Ramsey Clark ("Clark"), defense counsel for an individual charged with genocide by the ICTR. Clark was looking for people who could testify on behalf of his client and asked the respondent if he would be willing to help. Although he was scared of the possible consequences of testifying before the ICTR, he eventually agreed and made arrangements to leave Burkina Faso for Tanzania. When the respondent and his family received their refugee passports they were mistakenly under the impression that they had received asylum status in Burkina Faso.

Both the respondent and his wife were called to testify as defense witnesses for defendants before the ICTR.[2] In order to protect their identities so they would not be in danger as a result of their testimonies both were given witness numbers: the respondent was Witness # 5 and his wife was Witness # 22. During his testimony, however, the prosecutor, in a surprise move, asserted that the respondent had participated in genocide and was guilty of raping three women. This, coupled with information about his background that was revealed during his testimony, led to news reports in Africa that a "young Adventist preacher" and star of the church had been accused of genocide by the ICTR prosecutor. After he gave his testimony the respondent was fearful of what would happen to him because he knew of many SDA preachers who had been accused of genocide and jailed in Rwanda. The respondent and his family hoped to stay in a safe house in Tanzania until they could be assured further protection by the ICTR, but shortly after they gave their testimony they were forced to leave. Because the respondent refused to leave the safe house without assurances that he would be protected, he was handcuffed and driven to the airport. The chief of the Witness and Victims Support Section for the ICTR treated the respondent and his family in a hostile manner, did not allow them to take their possessions with them when they left the safe house, and threatened to send them back to Rwanda, calling them *interahamwe*, a military group known for participating in the genocide. They were flown back to Burkina Faso, but once they returned they no longer had the travel documents issued to them before leaving for Tanzania. Out of fear that they would be sent back to Rwanda by the government of Burkina Faso, they fled to Benin.

---

[2]The defendants were Ntakirutimana and his son. Both were found guilty of aiding and abetting genocide, and Ntakirutimana was later sentenced to ten years in prison.

Once in Benin, the respondent again sought asylum status through the UNHCR. The UNHCR advised him that he would have to return to Burkina Faso because it was the first place that he received a provisional UNHCR refugee document. The respondent continued to fear what might happen to him if he were forced to return to Rwanda. On the advice of Clark, who suggested he would be safe in Ghana, the respondent took his family there.

The respondent and his family arrived in Ghana in July of 2002. The respondent remained there until entering the United States on December 8, 2007. In Ghana, the respondent found work at an SDA church and served as the Accra Tertiary Institutions Chaplain in charge of SDA students at several Ghanaian educational facilities. While he was living in Ghana, some members of the respondent's church were critical of allowing an SDA pastor "accused of genocide" to live and work among them. The respondent and his family continued to live in fear despite having secured steady employment and having lived in Ghana without incident for 5 years. After his aunt died in 2007, the respondent decided to travel to the United States to visit his aunt's husband and children. He was able to obtain a non-immigrant visa to enter the United States and upon arriving here was issued an 1-94 set to expire on June 7, 2008. After arriving in the United States, the respondent traveled to Michigan in search of a refugee shelter willing to help him obtain asylum. He reached the Freedom House on December 16, 2007. The respondent applied for asylum on June 27, 2008.

The respondent's wife and daughter are currently living in Ghana under expired passports. The respondent fears worsening conditions for his family because he has since lost his job as a pastor for the SDA in Ghana and the church has asked his wife to leave the house she is currently living in. Additionally, according to a letter from a colleague, his wife has received several threatening phone calls from unknown persons.

The IJ denied Ndayisaba's requests for relief after concluding that he had failed to establish eligibility. The IJ recognized that criminal prosecution may serve as a pretext for persecution where it is motivated by a protected ground and the punishment is sufficiently serious. Although Ndayisaba offered evidence that those who testified in support of persons accused of genocide had been arrested and charged with genocide themselves, the IJ found "no evidence tending to show a nexus between

testimony as a witness and being arrested." She explained that "[i]t is equally plausible that the Rwandan government had evidence supporting the commission of crimes of genocide by the individuals who were arrested." She noted also that Ndayisaba had not been charged with any crime, and that, aside from the baseless allegations made by the ICTR prosecutor during cross-examination, "there is no suggestion that the Rwandan government suspects him of wrong-doing or plans to bring charges against him." Finally, the IJ declined to adopt the view that "prosecuting crimes of genocide is merely a pretext for persecution based on [a protected ground,]" reasoning that "[e]very country has a legitimate interest in investigating and prosecuting serious violent crimes perpetrated on its soil and against its people." She denied Ndayisaba's requests for withholding of removal and relief under CAT for the same reasons.

The BIA affirmed. It agreed with the IJ that there was no showing that those arrested after testifying were arrested because they testified. And it found nothing in the record, except for the ICTR prosecutor's allegations, showing that the Rwandan government suspects Ndayisaba of any wrongdoing or intends to charge him with a crime. It added that the ICTR prosecutor was reprimanded for making the baseless allegations; that Ndayisaba was permitted to depart Tanzania – where the ICTR convenes – without incident and never experienced problems with any government official, Rwandan or otherwise; that his wife also testified in support of the defense, and, apart from receiving vague, threatening phone calls from unidentified individuals in Ghana, where she resides, had suffered no harm; and that no attempt had been made to extradite his wife to Rwanda.

Ndayisaba timely petitioned for review.

II.

"Because the BIA adopted and supplemented the IJ's decision, we review the opinion of the IJ in conjunction with the BIA's additional comments and discussion." *Cruz-Samayoa v. Holder*, 607 F.3d 1145, 1149 (6th Cir. 2010). We review issues of law de novo and consider the factual findings of the BIA using the substantial-evidence standard. *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). The ultimate determination whether an alien has established past persecution or a well-founded fear of future persecution is reviewed under the substantial-evidence standard. *Japarkulova v. Holder*, 615 F.3d 696, 702 (6th Cir. 2010). Under this deferential standard of review, agency findings "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see Khalili*, 557 F.3d at 435; *see also Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004) (noting that 8 U.S.C. § 1252(b)(4)(B) "basically codifies the Supreme Court's substantial evidence standard"). We may not reverse simply because we would have decided the matter differently. *Khalili*, 557 F.3d at 435.

"The disposition of an application for asylum involves a two-step inquiry: (1) whether the applicant qualifies as a refugee as defined in 8 U.S.C. § 1101(a)(42)(A), and (2) whether the applicant merits a favorable exercise of discretion by the Attorney General." *Cruz-Samayoa*, 607 F.3d at 1150 (citation and internal quotation marks omitted). "To qualify as a refugee, the applicant must establish that he or she has suffered past persecution on the basis of race, religion, nationality, social group, or political opinion; or show that he or she has a well-founded fear of [future]

persecution on one of those same bases." *Id.* (citation, internal quotation marks, and alterations omitted); *see also* 8 C.F.R. § 1208.13(b).

To demonstrate a well-founded fear of future persecution, the alien must show that "'persecution is a reasonable possibility'" should he be sent back to his home country. *Perkovic v. INS*, 33 F.3d 615, 620 (6th Cir. 1994) (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 (1987)). The concept of well-founded fear "has both a subjective and an objective component: an alien must actually fear that he will be persecuted upon return to his country, and he must present evidence establishing an 'objective situation' under which his fear can be deemed reasonable." *Id.* at 620-21. An alien need not show that he "probably will be persecuted if he is deported; '[o]ne can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place.'" *Id.* (quoting *Cardoza-Fonseca*, 480 U.S. at 431). A well-founded fear of future persecution can be based on either a likelihood of harm specifically targeted at the alien or a "pattern or practice" of persecution of others similarly situated. 8 C.F.R. § 208.13(b)(2)(iii); *see Akhtar v. Gonzales*, 406 F.3d 399, 404 (6th Cir. 2005).

We have recognized that criminal prosecution can amount to persecution. *See Cruz-Samayoa*, 607 F.3d at 1151. "A petitioner may . . . establish that prosecution reaches the level of persecution if the individual can demonstrate that the prosecution or criminal investigation 'was actually pretext for persecution' on account of one of the INA's enumerated grounds." *Id.* (quoting *Lakaj v. Gonzales*, 158 F. App'x 678, 683 (6th Cir. 2005)). We consider the "substance and context" of the law an alien's native country is attempting to enforce to determine whether the government

is legitimately attempting to prosecute criminal activity, or is instead seeking only to persecute persons on account of a protected ground. *Id.* Prosecution under a general law can constitute persecution if the punishment is disproportionately severe to the offense. *Id.* at 1152.

We note first that Ndayisaba has abandoned any claim of past persecution by failing to raise the issue in his appellate brief. *See Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 280 n.5 (6th Cir. 2010). Thus, with respect to asylum, we need only consider whether the record compels a finding that Ndayisaba established a reasonable, well-founded fear of future persecution. We find that substantial evidence supports the determination that his fear is not well-founded.[3]

Ndayisaba allegedly fears being arrested and charged with genocide upon arrival in Rwanda because he testified before the ICTR on behalf of a defendant charged with genocide. Although his application for relief indicates that he seeks relief based on all five protected grounds, his appellate brief argues persecution only on account of his "ethnicity and testimony before the ICTR in support of a Hutu Seventh Day Adventist Pastor accused of genocide." Counsel further clarified at oral argument that Ndayisaba fears persecution solely on account of his membership in a particular social group, which we assume consists of members of the Hutu tribe who testified on behalf of those accused of genocide. Neither the IJ nor the BIA conducted any analysis of whether this asserted group qualifies as a "particular social group," and the parties do not address the issue in their

---

[3]The IJ found Ndayisaba credible, which means he established the subjective component of his burden. *See Akhtar*, 406 F.3d at 404 ("The subjective fear component turns largely upon the applicant's own testimony and credibility." (quoting *Capric v. Ashcroft*, 355 F.3d 1075, 1085 (7th Cir. 2004))). The BIA did not disturb this finding.

appellate briefs. We assume, without deciding, that Ndayisaba's asserted social group is sufficiently particularized to warrant recognition as a "particular social group" for purposes of asylum and withholding of removal. *See generally Kante v. Holder*, 634 F.3d 321, 327 (6th Cir. 2011); *In re A-M-E & J-G-U*, 24 I. & N. Dec. 69, 74 (BIA 2007).

Ndayisaba asserts that any criminal prosecution would be a mere pretext for persecution on account of his past testimony before the ICTR. The IJ rejected this claim. She found no evidence to support the view that prosecuting the crime of genocide in Rwanda serves as a pretext for persecuting defense witnesses for their prior testimony. To be sure, Ndayisaba did offer evidence showing that those who testified were themselves arrested and prosecuted, but the IJ found no evidence of a connection between testifying and being arrested and prosecuted. She found it equally plausible that authorities had legitimate reason to believe that those arrested and charged after testifying had themselves participated in genocide.

Contrary to the IJ's conclusion, however, there *is* record evidence demonstrating that some persons who testified for the defense were later arrested, despite a lack of evidence to support the arrest and detention. This suggests that they were arrested merely as a pretext for persecution on account of their testimony.

Additionally, Ndayisaba offered an *amicus* brief filed by the Human Rights Watch ("HRW") in an unrelated ICTR prosecution arguing against the ICTR prosecutor's request to have the matter transferred to a Rwandan court. The HRW argued that the accused would not get a fair trial in Rwanda in part because potential defense witnesses would be deterred from testifying out of fear of

being prosecuted by the Rwandan government for harboring "genocidal ideology." The brief

indicates that witnesses who appeared for the defense in proceedings before the ICTR were arrested

and detained shortly after they returned to Rwanda:

> In several cases documented by HRW, witnesses who have appeared for the defence at the ICTR were arrested after their return to Rwanda. In one case, the witness was detained without charge for two years and then released. In another case, in 2005, where a witness was himself falsely accused of genocide, the prosecutor general acknowledged in writing that there was no proof, although as of this writing [on January 3, 2008,] the person is still detained. Although these witnesses and others had testified as protected witnesses, many in their communities knew of their testimony and attributed their arrests to that testimony.

There is also evidence that the fear harbored by potential defense witnesses is so strong that many

forego testifying on behalf of those they know to be innocent. The HRW brief illustrates one

example:

> In the last two months alone, HRW has documented four cases of persons who refused, out of fear, to testify in defence of persons whom they knew to be innocent of the charges against them. In a recent case, a man who was too frightened to testify in defence of a person who had saved his life and that of more than ten family members broke down in tears while describing his shame to a HRW researcher.

Ramsey Clark testified regarding the difficulty in locating persons who could testify on behalf of his

clients because many feared that testifying would subject them to arrest, detention, torture, and

possible death at the hands of the Rwandan government simply for testifying.

Despite this evidence of some nexus between testifying and criminal prosecution, however,

it is equally plausible, as the IJ concluded, that many, if not most, arrests and detentions of ICTR

defense witnesses are legitimate. Indeed, as the government emphasizes on appeal, the HRW *amicus*

brief expressly "makes no judgments on the merits of the arrests or indictments" of ICTR defense

witnesses who returned to Rwanda. And the fact that many witnesses were arrested shortly after they testified might suggest that their testimony provided the necessary evidence to support their arrest and prosecution (though it might also suggest that the witnesses were arrested and charged simply because they testified). Given this evidence and the different inferences one may permissibly draw from it, the IJ was permitted to conclude that Ndayisaba had failed to demonstrate that Rwanda uses baseless arrest, detention, and prosecution as a method of persecuting defense witnesses in genocide cases.

The IJ also determined that Ndayisaba's fear was not well-founded because, apart from his own fear, there was no other evidence that he, specifically, would be arrested and prosecuted if he returned to Rwanda. She noted a lack of evidence demonstrating that the Rwandan government suspects him of any wrongdoing or plans to bring charges against him. She noted also that he has not been indicted for any crime by the Rwandan government. The BIA added that Ndayisaba's wife, who also testified on behalf of Ntakirutimana, has not been arrested or charged with a crime and "continues to live in Africa with her daughter."

But this reasoning is faulty. The fact that Ndayisaba has not been indicted does not foreclose a reasonable probability that he will be once he returns to Rwanda. Nor does it necessarily make it *less* likely that he will be indicted upon return.[4] Also, the fact that his wife continues to live safely *in Ghana*, thousands of miles from Rwanda, does not demonstrate that he will not be prosecuted if

---

[4]However, Ndayisaba's counsel admitted at oral argument that Rwanda has indicted persons *in absentia*, making it less likely that Rwanda intends to indict him if he returns.

he returns *to Rwanda*. *Cf. Lim v. INS*, 224 F.3d 929, 935 (9th Cir. 2000) (holding that the ongoing safety of family members in an alien's country of origin mitigates a well-founded fear when family members are "similarly situated to the applicant and thus presumably subject to similar risk"); *accord Yang Lin v. Holder*, 320 F. App'x 428, 435 n.5 (6th Cir. 2009) (per curiam).

Nevertheless, the record does not *compel* the conclusion that Ndayisaba's fear of being baselessly arrested, detained, and prosecuted when he returns to Rwanda is well-founded. In addition to the fact that he has not been charged with genocide, there is further support in the record for the IJ's conclusion. One of Ndayisaba's co-directors at the SDA complex in Mugonero, over which Ntakirutimana presided, has not been arrested, detained, or charged with genocide, despite his close affiliation with Ntakirutimana during the 1994 genocide. Rather, he is working as President of the SDA East Rwanda Association in Rwanda's capital city. And although another co-director has been arrested and is soon to be tried for genocide (as of Ndayisaba's immigration merits hearing), there is no indication that the co-director testified before the ICTR on behalf of Ntakirutimana, or, if he did, that his testimony was the motivation behind the arrest and prosecution.

But even if the record compelled the conclusion that Ndayisaba would be arrested and charged with genocide were he to return to Rwanda, it does not also compel concluding that a prosecution would be a mere pretext for persecuting him on account of his testimony before the ICTR and his protected social group status. Ndayisaba potentially implicated himself when he testified on behalf of Ntakirutimana, whom the ICTR later determined was guilty of aiding and abetting genocide. And "neither the BIA nor the federal court of appeals has the jurisdiction to

determine whether [Ndayisaba] is, in fact, guilty of the [potential] charges levied, and the mere fact

that he proclaims innocence is an insufficient basis upon which to determine that the charges are

pretextual." *Cruz-Samayoa*, 607 F.3d at 1152.

Despite record support for a contrary view, the record does not compel the conclusion that

Ndayisaba has a reasonable, well-founded fear of being baselessly prosecuted on account of his

earlier testimony on behalf of one accused of genocide.[5]

III.

Ndayisaba offers for our consideration additional information that he contends supports his

requests for relief but was apparently unavailable at his merits hearing. He has not made clear

exactly what he wants us to do with this information, suggesting at times that we should consider

it directly in these proceedings and at other times that we should remand the matter so the BIA can

consider it.

We cannot consider this newly offered information in the first instance. The statutory

provision establishing the scope of judicial review of a final order of removal provides that "the

court of appeals shall decide the petition *only on the administrative record on which the order of*

*removal is based*." 8 U.S.C. § 1252(b)(4)(A) (emphasis added); *see Bejjani v. United States*, 271

F.3d 670, 676 (6th Cir. 2001) ("[T]his Court is prohibited [in immigration cases] from considering

---

[5]Because Ndayisaba cannot carry his burden with respect to asylum, he necessarily cannot do so with respect to withholding of removal. *Singh v. Ashcroft*, 398 F.3d 396, 401 (6th Cir. 2005). As for Ndayisaba's CAT claim, we find that substantial evidence supports the BIA's determination that Ndayisaba failed to demonstrate that it is more likely than not that he will be tortured if he is removed to Rwanda. *See* 8 C.F.R. § 1208.16(c)(2).

facts not in the administrative record . . . ."), *abrogated on other grounds by Fernandez-Vargas v. Gonzales*, 548 U.S. 30 (2006); *see also* 28 U.S.C. § 2347(a) ("Unless determined on a motion to dismiss, petitions to review orders reviewable under this chapter are heard in the court of appeals on the record of the pleadings, evidence adduced, and proceedings before the agency, when the agency has held a hearing whether or not required to do so by law."). Therefore, we cannot consider the new facts, and we have not done so.

Nor can we remand the matter to the BIA so it can consider the new information. The INA's review provisions specifically forbid it: "Judicial review of a final order of removal . . . is governed only by chapter 158 of Title 28 [28 U.S.C. §§ 2341-2351], except as provided in subsection (b) of this section and *except that the court may not order the taking of additional evidence under section 2347(c) of such title.*" 8 U.S.C. § 1252(a)(1) (emphasis added); *see Fang Huang v. Mukasey*, 523 F.3d 640, 656 (6th Cir. 2008) ("[W]e lack a statutory basis for remanding her case or for supplementing the record.").

Ndayisaba is not foreclosed from presenting the new information in support of his application for relief; it is just that *we* cannot consider it or order the BIA to do so. He must follow the proper procedure for presenting the evidence, which involves filing a motion to reopen his proceedings before the BIA. *See* 8 U.S.C. § 1229a(c)(7); 8 C.F.R. § 1003.2(c); *Japarkulova*, 615 F.3d at 702. There are no time limitations for moving to reopen based on changed circumstances in the alien's home country so long as the evidence is material and could not have been discovered or presented previously. *See* 8 U.S.C. § 1229a(c)(7)(C)(ii); 8 C.F.R. § 1003.2(c)(3)(ii).

IV.

For these reasons, we deny the petition for review.