NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0004n.06

No. 21-4125

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| ANSLY DAMUS, | ) | **FILED** |
| Petitioner, | ) | Jan 04, 2023 |
|  | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | ON PETITION FOR REVIEW FROM THE UNITED STATES BOARD OF IMMIGRATION APPEALS |
| MERRICK B. GARLAND, Attorney General, | ) |  |
| Respondent. | ) | OPINION |
|  | ) |  |

Before: SUTTON, Chief Judge; DONALD and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. Ansly Damus, a Haitian, seeks asylum in the United States based on the harm that he suffered in his homeland. Under our asylum laws, however, immigrants may not obtain asylum if they have "firmly resettled" in a different country before they enter the United States. 8 U.S.C. § 1158(b)(2)(A)(vi). And we treat an immigration judge's decision that an immigrant has "firmly resettled" in another country as a factual finding subject to a deferential standard of review. This standard forecloses Damus's asylum request here because substantial evidence supported the immigration judge's finding that he had firmly resettled in Brazil before coming to the United States. That conclusion leaves only Damus's request for relief under the withholding-of-removal statute, which would permit Damus to remain in this country if his "life or freedom would be threatened" in Haiti as a result of his "political opinion[.]" *Id.* § 1231(b)(3)(A). Yet we likewise treat a judge's conclusion that an immigrant would not face that

type of harm as a factual finding.  Here again, substantial evidence supported the judge's decision that Damus had not shown the required likelihood of harm.  We thus deny his petition for review.

I

Damus was born and raised in Haiti.  He married a Haitian and had two children, all of whom remain in that country.  Damus obtained a position as a teacher in 2007 and taught math and science for the next seven years.

In September 2014, Damus held a seminar at his church to teach young people about ethics, morals, and staying out of trouble.  During his talk, Damus identified a certain local politician as someone that the youths should not emulate because the politician had become corrupt after his rise to power.  This politician's private supporters—a group called different things in the record, including "La Meezorequin"—learned of Damus's statements and believed that he had attempted to persuade people not to vote for the politician.  According to Damus, members of La Meezorequin attacked him as he traveled to his father's home after the seminar.

Ten days later, Damus fled Haiti.  He made his way to Brazil in December 2014.  Damus stayed there for a year and a half.  After receiving a work permit, Damus took a job as an electrician with a construction firm.

Damus eventually entered the United States in October 2016.  At the border, he told immigration authorities that he had traveled to this country "[t]o find a better life and find work" and that nobody would harm him if he returned to Haiti.  Admin. R. ("A.R.") 857.

Damus backtracked on these statements two months later during an interview with an asylum officer.  After describing La Meezorequin's prior attack, he now claimed that he feared this group if he returned to Haiti.  When asked about his separate time in Brazil, Damus noted that he had "applied" for (and "eventually" would have obtained) "residency" in that country.  A.R.

844. Damus reported, however, that he did not feel safe in Brazil because of discrimination against Haitians. The asylum officer found that Damus had shown a credible threat of persecution in Haiti. But the officer added that Damus might have "firmly resettled" in Brazil before he came here. 8 U.S.C. § 1158(b)(2)(A)(vi).

Immigration authorities commenced removal proceedings against Damus. He conceded his removability but applied for asylum and withholding of removal. (He also sought relief under the Convention Against Torture but abandoned that request in the immigration proceedings.) Over the next several years, Damus's case took three trips back and forth between the immigration court and the Board of Immigration Appeals.

*Round One*. After an evidentiary hearing, an immigration judge granted Damus asylum. The judge reasoned that La Meezorequin's prior attack on Damus (among other evidence) showed that he had suffered past persecution in Haiti and created a presumption of future persecution there. The judge thought that this persecution had arisen on account of Damus's membership in a "particular social group"—what the judge defined as "well-known professors in Haiti who openly teach young people." A.R. 738–39.

The Board reversed. It held both that La Meezorequin's prior attack did not rise to the level of "persecution" and that the immigration judge had not identified a cognizable "particular social group." The Board ordered the judge to consider on remand whether Damus might fear persecution on account of his political opinion because the prior attack had allegedly resulted from his criticism of a politician. It also ordered the judge to consider new evidence about whether the asylum statute's "resettlement bar" applied. A recently discovered "Joint Communique" from Brazil allegedly showed that the country had awarded permanent residency to some 43,000 Haitians, including Damus.

3

*Round Two*. After another evidentiary hearing, the immigration judge again granted asylum to Damus. The judge rejected the resettlement bar on the ground that the government had not made a prima facie showing that Damus could obtain permanent residency in Brazil. The Joint Communique, the judge reasoned, left unclear whether Brazil had granted the listed Haitians permanent residency or merely allowed them to apply. The judge next held that Damus had established a well-founded fear of persecution in Haiti as a result of his political opinion. According to the judge, Damus reasonably feared La Meezorequin because the local politician backed by this group remained angry with him.

The Board again reversed. It held that the immigration judge committed clear error in finding that the government did not make out a prima facie case that the resettlement bar foreclosed Damus's asylum claim. As the Board saw things, the Joint Communique plainly noted that everyone on the list qualified for permanent residency if they filed the proper paperwork. It remanded again for the judge to consider whether Damus could establish that he remained ineligible for permanent residency in Brazil despite this evidence.

*Round Three*. After a third evidentiary hearing, the immigration judge denied Damus asylum and withholding of removal. The judge found that the resettlement bar doomed Damus's asylum claim because he did not rebut the government's proof that he could have stayed in Brazil. The judge next rejected Damus's request for withholding of removal because he had not shown a likelihood that he would face harm in Haiti.

This time, the Board upheld the judge's decision. It agreed that the resettlement bar prohibited Damus from seeking asylum. And it held that the immigration judge had not committed clear error in finding that Damus did not prove a likelihood of future persecution in Haiti, which foreclosed his withholding-of-removal claim.

## II

Damus now argues that the record compels the conclusion that he had not firmly resettled in Brazil (for asylum) and that he would face harm in Haiti (for withholding of removal).

### A. Asylum

The asylum statute gives the government discretion to grant asylum to immigrants who have faced "persecution" or have a "well-founded fear of persecution" in their home countries "on account of" such things as their "political opinion[.]" 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(A). But the statute goes on to list circumstances in which the government may not grant this relief, including if an immigrant "was firmly resettled in another country prior to arriving in the United States." *Id.* § 1158(b)(2)(A)(vi). Damus argues that the Board wrongly held that he had firmly resettled in Brazil. Our deferential standard of review bars us from accepting his claim.

#### 1

What did the phrase "firmly resettled" mean when Congress adopted it in 1996? *See Ali v. Reno*, 237 F.3d 591, 594 (6th Cir. 2001). The average person might have understood the phrase to require an immigrant to have "establish[ed] a permanent residence" in that country without "hesitation" or "doubt." 5 *Oxford English Dictionary* 956 (2d ed. 1989) (defining "firmly"); 15 *Oxford English Dictionary*, *supra*, at 82–86 (defining "settle"). But perhaps we should consider how the average immigration lawyer would have understood the phrase, since the concept had developed a legal meaning well before 1996. *See Matter of A-G-G-*, 25 I. & N. Dec. 486, 489–94 (B.I.A. 2011) (discussing history); *see also Rosenberg v. Woo*, 402 U.S. 49, 52–58 (1971).

Ultimately, though, we need not start from scratch on this question. The executive branch has long offered its own definition in a regulation that Damus does not challenge (and thus that we may accept for his case). 8 C.F.R. § 1208.15 (2019); *see* 62 Fed. Reg. 10,313, 10,343 (1997).

(The government amended this regulation in 2020, *see* 85 Fed. Reg. 80,380, 80,397–98 (2020), but the parties agree that the new rules do not apply retroactively.) The regulation adopted a presumption that immigrants had "firmly resettled" in a country if that country had given them "an offer of permanent resident status, citizenship, or some other type of permanent resettlement" either before or after they entered it. 8 C.F.R. § 1208.15 (2019). But immigrants could rebut this presumption if they made one of two showings, including that the "conditions" of their "residence" "were so substantially and consciously restricted by the authority of the country" that they were not "in fact resettled." *Id.* § 1208.15(b). To help courts decide whether an immigrant had made this rebuttal, the regulation directed them to consider several factors, including the conditions in which other residents lived and the housing and employment options available to the immigrant. *Id.*

The Board has adopted a four-step framework to determine whether an immigrant has firmly resettled in another country within the meaning of § 1208.15. *See Thiam v. Holder*, 677 F.3d 299, 303 (6th Cir. 2012) (discussing *Matter of A-G-G-*, 25 I. & N. Dec. 486 (B.I.A. 2011)). We may also accept this "framework" for purposes of Damus's case because he again makes no claim that it is "[in]consistent with the law." *Id.*; *cf. Hanna v. Holder*, 740 F.3d 379, 394 (6th Cir. 2014). Like the regulation, the Board's framework "focuses exclusively on the existence of an offer" of permanent resettlement from the country. *A-G-G-*, 25 I. & N. Dec. at 501; *cf. Garadah v. Ashcroft*, 86 F. App'x 76, 81 (6th Cir. 2004).

The framework follows a burden-shifting approach. At the first step, the government must introduce "prima facie evidence" that a country had made "an offer of firm resettlement" so that an immigrant could stay in the country indefinitely. *A-G-G-*, 25 I. & N. Dec. at 501; *see Hanna*, 740 F.3d at 393. If the government makes this showing, the burden shifts to the immigrant at the

second step to present evidence that the immigrant nevertheless remained ineligible to reside in the country indefinitely. *A-G-G-*, 25 I. & N. Dec. at 503. At the third step, the judge must consider the entire record to decide whether the immigrant has proven by a preponderance of the evidence that the country did not make an offer of firm resettlement. *See id.* If the judge finds that an offer was in fact made, the immigrant could lastly attempt to prove at the fourth step that one of the two regulatory exceptions nevertheless applies. *See id.*; *see, e.g.*, *Hanna*, 740 F.3d at 395–96.

When it comes to our own review of the Board's analysis, we treat the ultimate conclusion that an immigrant has "firmly resettled" in a country as a factual finding triggering the substantial-evidence test that governs the findings of historical fact. *See, e.g.*, *Hussam F. v. Sessions*, 897 F.3d 707, 719 (6th Cir. 2018) (per curiam); *Hanna*, 740 F.3d at 386. The immigration laws thus require us to view this "administrative finding[]" as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary[.]" 8 U.S.C. § 1252(b)(4)(B). That "highly" deferential test does not permit us to overturn a firm-resettlement finding simply because we disagree with it; rather, we may reverse only if no reasonable adjudicator could have reached the Board's finding on the record presented. *Rodriguez de Palucho v. Garland*, 49 F.4th 532, 540 (6th Cir. 2022) (quoting *Garland v. Ming Dai*, 141 S. Ct. 1669, 1677 (2021)).

2

Applying this test here, we see no basis to overturn the finding that Damus had firmly resettled in Brazil. Substantial evidence supported the Board's reasoning at each of its steps.

*Step One*. The Board reasonably found that Brazil's Joint Communique was prima facie evidence that the country had given Damus an offer to firmly resettle there. Under the Board's framework, the government may meet its burden using direct evidence of a country's offer of permanent residency (such as the issuance of official papers) or indirect evidence of it (such as the

7

passage of laws that render an entire class eligible for the residency). *See A-G-G-*, 25 I. & N. Dec. at 501–02. Here, the Joint Communique stated that Brazil "AWARDS permanent residence to the" thousands of Haitians on its list, which included Damus and his passport number. A.R. 695–97. To be sure, the Communique also required these Haitians to, among other things, file an application with photos, a birth certificate, and a declaration that they had not been criminally prosecuted. *Id.* Under the Board's unchallenged framework, though, a failure to follow required administrative steps is irrelevant at this initial stage. *See A-G-G-*, 25 I. & N. Dec. at 503.

Damus argues that the Joint Communique did not establish a prima facie case because (he claims) it incorporated an earlier Brazilian resolution that granted only temporary (not permanent) visas to Haitians and required them to identify employment-related reasons for moving to Brazil. The government counters with jurisdictional and merits arguments. It initially says that we lack jurisdiction over this claim because Damus failed to exhaust it on his third trip to the Board. Yet Damus raised the claim during the second appeal in which the Board held that the government had established a prima facie case. He could not seek judicial review at that time because this second decision did not qualify as a final order. *See* 8 U.S.C. § 1252(a)(1). On the third appeal, moreover, the Board held that its earlier decision qualified as "law of the case." A.R. 4. So Damus sought judicial review of the issue at the earliest time he could. And the Board's later law-of-the-case finding cannot insulate its earlier analysis from our appellate review under traditional law-of-the-case principles. *See Samons v. Nat'l Mines Corp.*, 25 F.4th 455, 465 (6th Cir. 2022).

The government fares better on the merits. The record did not compel the Board to find that the Joint Communique incorporated the earlier resolution's limits. *See Rodriguez de Palucho*, 49 F.4th at 540. Among other things, the Joint Communique in a prefatory statement merely noted that it had "[c]onsider[ed]" the earlier resolution, and its plain text later awarded "permanent" (not

temporary) residency. A.R. 695. The Communique also contained terms that conflicted with any intent to incorporate the prior resolution's limits. The resolution, for example, restricted the number of temporary visas allowed to 1,200 Haitians per year, but the Communique made some 43,000 Haitians eligible for residency in one fell swoop.

One final point about this first step. The Board's second decision held that the immigration judge had committed a "clear error" in finding that the government had not met its prima facie case. A.R. 330. Because the Board does not make its own factual findings, 8 C.F.R. § 1003.1(d)(3)(iv)(A), this clear-error holding might look more like a *legal* determination than a *factual* one. *Cf. Rosales Justo v. Sessions*, 895 F.3d 154, 161–62 (1st Cir. 2018). But Damus conceded that we should apply the substantial-evidence test, so we need not consider the issue.

*Steps Two and Three*. The Board (and immigration judge) next reasonably found that Damus failed to rebut the government's prima facie case with evidence that he did not qualify for permanent residency. Damus agreed that his name showed up on the Joint Communique. And as the immigration judge explained, he did not provide "any evidence" in any of his three evidentiary hearings that he was nonetheless ineligible for permanent residency in Brazil on an immigrant-specific ground. A.R. 102. He conceded, for example, that he had no criminal record.

Damus responds that he did not even know of the Joint Communique or his eligibility for permanent residency. Setting aside that he told an asylum officer that he had "applied" for (and "eventually" would have obtained) "residency" in Brazil, A.R. 844, this claim legally fails under the regulation and Board framework that Damus does not challenge. The regulation requires only that the country *make* "an offer of permanent resident status," not that an immigrant *learn of and accept* this offer. 8 C.F.R. § 1208.15 (2019). The Board has thus held that an offer can be "made" simply by a country's legislative decision to have immigrant-friendly laws that rendered an

immigrant eligible. *See A-G-G-*, 25 I. & N. Dec. at 502–03. Just as the immigrant need not know of these laws, so too Damus did not need to know of the Joint Communique.

*Step Four*. Lastly, the Board (and immigration judge) reasonably found that Damus did not fall within his requested regulatory exception because he failed to show that the Brazilian government had "substantially and consciously restricted" the "conditions" on his "residence" there. 8 C.F.R. § 1208.15(b) (2019). Damus offered no evidence that Brazil's offer of permanent residence contained any strings attached limiting his freedom. He did not claim, for example, that the Brazilian government limited his employment options. *See id.* To the contrary, he had its approval to work in his chosen field as an electrician. Nor did he claim that this government limited his housing options. *See id.* By all accounts, he made his own choice to rent the room in which he lived with his brother-in-law. He also did not cite more general evidence suggesting that the Brazilian government restricted the ability of Haitians to live in the country. Indeed, Brazil issued its Joint Communique in recognition of "the reception and social integration of Haitians in Brazilian territory." A.R. 695.

Damus responds that the conditions on his Brazilian residency were restricted because Brazilians (including his coworkers) allegedly treated Haitians "like animals" and discriminated against them. A.R. 124, 126. Damus also points to instances of criminal acts, including murders, committed against Haitians. Yet this evidence did not compel the Board to find that he fell within this regulatory exception. *See Rodriguez de Palucho*, 49 F.4th at 540. Most notably, Damus did not identify anything to suggest that the *government* (in contrast to *private parties*) engaged in the discriminatory or criminal acts—as the regulation requires. *See* 8 C.F.R. § 1208.15(b) (2019); *cf. Dort v. U.S. Att'y Gen.*, 2022 WL 1558918, at *7 (11th Cir. May 17, 2022) (per curiam). In fact, one of his cited news articles about crimes against Haitians indicated that Brazilian officials

10

condemned "violence and xenophobia" against Haitians. A.R. 275. Damus also failed to identify specific acts of discrimination against him personally; his testimony remained, in the words of the immigration judge, persistently "general and vague." A.R. 130. And he conceded that he never suffered physical harm of any kind. Substantial evidence thus supported the decision to apply the resettlement bar to Damus's request for asylum.

## B. Withholding of Removal

The withholding-of-removal statute prohibits the government from removing an immigrant to a country if the immigrant's "life or freedom would be threatened in that country" because of certain protected traits, including the immigrant's "political opinion." 8 U.S.C. § 1231(b)(3)(A). The Supreme Court has read this text as requiring immigrants to show that a "clear probability" exists—in other words, that "it is more likely than not"—that they would face harm in a country on account of a protected trait. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 430 (1987); *INS v. Stevic*, 467 U.S. 407, 421–29 (1984); *see also* 8 U.S.C. § 1229a(c)(4)(A)(i). The circuit courts have read the text as requiring immigrants to establish that they would likely face "persecution," a word used in the asylum statute. *See Rodriguez de Palucho*, 49 F.4th at 536 (citing cases).

Under the regulations, immigrants may satisfy their burden to prove that they would likely suffer persecution in two ways. 8 C.F.R. § 1208.16(b). They can trigger a rebuttable presumption that they will face persecution in a country if they prove that they have suffered *past* persecution (on account of a protected trait) there. *Id.* § 1208.16(b)(1)(i). Alternatively, if immigrants lack evidence of past persecution, they still may attempt to directly prove that they would face future persecution (again on account of a protected trait) if they returned to the country. *See id.* § 1208.16(b)(2); *Almuhtaseb v. Gonzales*, 453 F.3d 743, 750 (6th Cir. 2006).

11

As with a firm-resettlement ruling, we treat the ultimate conclusion that an immigrant has suffered past persecution or would likely face future persecution as a factual finding subject to the deferential substantial-evidence test. *See Lopez-Lopez v. Garland*, 2022 WL 168788, at *2 (6th Cir. Jan. 19, 2022); *Kamar v. Sessions*, 875 F.3d 811, 817–18 (6th Cir. 2017); *Ndayisaba v. Holder*, 457 F. App'x 552, 557 (6th Cir. 2012). We thus must uphold an agency "finding[]" that an immigrant's evidence did not prove past or future persecution as long as a "reasonable adjudicator" could have entered the finding. 8 U.S.C. § 1252(b)(4)(B). Damus cannot overcome this deferential standard of review with respect to either of his two theories of persecution.

*Past Persecution*. We have described persecution as an "extreme concept" that requires significant harm. *Ali v. Ashcroft*, 366 F.3d 407, 410 (6th Cir. 2004) (citation omitted). Harassment and discrimination generally do not suffice. *See Mikhailevitch v. INS*, 146 F.3d 384, 389–90 (6th Cir. 1998). Even a single instance of physical violence will fall short unless the violence rises to a level of "sufficient severity[.]" *Lumaj v. Gonzales*, 462 F.3d 574, 577 (6th Cir. 2006); *see also, e.g.*, *Lopez-Lopez*, 2022 WL 168788, at *3 & n.1 (citing cases).

Our precedent also sets a high bar for determining when a single assault is "sufficiently" severe. As one example, we held that an immigration judge reasonably rejected a past-persecution claim when an immigrant alleged that he had been "beaten by policemen, resulting in head injuries and a week-long hospitalization." *Pilica v. Ashcroft*, 388 F.3d 941, 954 (6th Cir. 2004). As another example, we held that an immigration judge reasonably rejected a past-persecution claim when a soldier had hit an immigrant "with a rifle until he fell to the floor unconscious" and the immigrant woke up "tied to a tree with severe bruises and other injuries to his legs." *Traore v. Holder*, 358 F. App'x 677, 678, 680 (6th Cir. 2009) (per curiam). As a third example, we held that an immigration judge reasonably rejected a past-persecution claim when the police had beaten an

immigrant "with a wooden club and cut him with a steel blade such that he still ha[d] scars on his back." *Lian v. Holder*, 414 F. App'x 790, 792, 794–95 (6th Cir. 2011).

When the record here is measured against this caselaw, the Board (and immigration judge) could reasonably conclude that Damus did not establish past persecution. The immigration judge found that he suffered a single "attack" that caused "minor injuries." A.R. 103. A "reasonable adjudicator" could have made this finding by the time of the third evidentiary hearing because Damus's story had morphed significantly over the proceedings. 8 U.S.C. § 1252(b)(4)(B). At one point, he swore that members of La Meezorequin had "dragged and beat [him], breaking several bones and leaving [him] with scars[.]" A.R. 280. Yet he later testified that he did not seek medical treatment for this attack because he did not suffer any broken bones. A.R. 153–55. Damus also at one point stated that his "skin got peeled off" his arms during the attack. A.R. 156. Yet, when confronted with Facebook photos showing no arm injuries a few weeks after the attack, Damus conceded that his injuries had been more like "scratches." A.R. 162, 164. Those types of scratches would be far less severe than other injuries that our prior cases have found insufficient to prove past persecution. *See, e.g.*, *Pilica*, 388 F.3d at 954.

In response, Damus criticizes the immigration judge for issuing conflicting rulings between the first opinion (which described his injuries as "serious") and the third opinion (which described his injuries as "minor"). *Compare* A.R. 739, *with* A.R. 103. Yet any discrepancy has a readily identifiable source: Damus's own evolving testimony. He failed to acknowledge that he had not suffered "big injuries" or "big wounds" until the third evidentiary hearing. A.R. 162. And he points to no law that bars a court from changing its findings in response to changing testimony.

Damus next argues that the immigration judge did not adequately account for other evidence of persecution. He also testified that individuals threatened his wife after he left Haiti

and that his sister and brother had been forced to relocate. True, an immigration judge should consider the "overall context" when deciding whether an immigrant has been persecuted. *Gilaj v. Gonzales*, 408 F.3d 275, 285 (6th Cir. 2005) (per curiam). But even combining this other evidence with the single assault, a reasonable adjudicator could still conclude that Damus failed to show past persecution. Among other contrary evidence, Damus's wife, father, and siblings all lived harm-free in Haiti for years. In a letter of support, Damus's brother also failed to mention any threats against himself. And a supporting letter from Damus's wife was vague on the who, when, and why of the threats against her; it did not even mention the politician who was the source of the purported harassment campaign. On this record, the immigration judge could reasonably find that Damus had shown only the types of "isolated occurrences" that fall short of past persecution. *Pilica*, 388 F.3d at 954.

*Future Persecution.* Even though Damus did not establish past persecution, he still could obtain relief if he showed that it was more likely than not that he would be persecuted in Haiti upon his return. 8 C.F.R. § 1208.16(b)(2). Here too, however, the immigration judge reasonably found that Damus failed to prove such a likelihood. When entering the United States, Damus himself admitted to immigration authorities that nobody in Haiti would harm him there. And again, his family had lived in Haiti without injury for years.

The concept of "persecution," moreover, has a state-action element that required Damus's feared harm to originate from the Haitian government or from actors that this government could not or would not control. *See Rodriguez de Palucho*, 49 F.4th at 536, 540–41; *Ortiz v. Garland*, 6 F.4th 685, 688 (6th Cir. 2021). It is thus noteworthy that, by the time of the last evidentiary hearing, the politician whom Damus criticized had been voted out of office and no longer served

14

in the government.  Any future harm by members of La Meezorequin thus would not spring from the orders of a government actor.

In response, Damus argues that the political party from this local politician still holds power in Haiti.  Yet Damus offered no evidence that his 2014 speech criticizing a specific local politician even mentioned—let alone criticized—the national party.  Nor did he show that La Meezorequin, an allegedly local gang, did the bidding of anyone other than the individual that he criticized.  The immigration judge thus reasonably concluded that any fear of harm from an out-of-office politician for an eight-year-old slight was tenuous at best.

We end with a disclaimer on another standard-of-review question.  In the first appeal, the Board treated the immigration judge's ultimate conclusion that Damus had not shown "past persecution" as resolving a legal question subject to its "de novo review[.]"  A.R. 666.  We, by contrast, have characterized this ultimate conclusion as resolving a factual question subject to deferential review.  *See Lopez-Lopez*, 2022 WL 168788, at *2 (citing *Ouda v. INS*, 324 F.3d 445, 451 (6th Cir. 2003)).  Can the same question be legal for the Board and factual for us?  We need not attempt to reconcile this differential treatment in Damus's case because he does not now take issue with the Board's standard of review and also concedes that we should apply substantial-evidence review.  *Cf. Rosiles-Camarena v. Holder*, 735 F.3d 534, 536–38 (7th Cir. 2013).  His briefing choices allow us to save this issue for another day.

We deny the petition for review.