NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0043n.06

Case No. 22-3818

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

YAQUELIN MAGALY OCHOA-LANDA
VERDE,

    Petitioner,

v.

MERRICK B. GARLAND, Attorney General,

    Respondent.

)
)
)
)
)
)
)
)
)
)
)
)

**FILED**
Jan 30, 2024
KELLY L. STEPHENS, Clerk

ON PETITION FOR REVIEW
FROM THE UNITED STATES
BOARD OF IMMIGRATION
APPEALS

OPINION

Before: SILER, NALBANDIAN, and MATHIS, Circuit Judges.

**MATHIS, Circuit Judge.** Yaquelin Magaly Ochoa-Landa Verde seeks review of a final order of the Board of Immigration Appeals ("BIA") dismissing her appeal from an Immigration Judge's ("IJ") denial of her applications for asylum and withholding of removal under the Immigration and Nationality Act ("INA"), and for relief under the Convention Against Torture ("CAT"). For the reasons below, we deny the petition for review.

**I.**

Ochoa-Landa Verde, a native and citizen of El Salvador, unlawfully entered the United States in April 2015. In June 2015, the Department of Homeland Security charged her as removable under the INA, 18 U.S.C. § 1182(a)(7)(A)(i)(I), and ordered her to appear before an IJ. Ochoa-Landa Verde then applied for asylum, withholding of removal, and CAT protection.

Ochoa-Landa Verde claimed that her life would be at risk if she returned to El Salvador. Her fears stemmed from an incident at a political rally on February 5, 2015, where she had gathered to support a mayoral candidate from the Grand Alliance for National Unity ("GANA") party. According to Ochoa-Landa Verde, gang members hired by a rival political party, the Farabundo Marti National Liberation Front, interrupted the event. The gang members burned flags and fired shots into the air to frighten the attendees. A stray bullet struck and killed Ochoa-Landa Verde's twelve-year-old cousin. She recognized the shooter, who threatened to shoot her too but instead fled the scene. Later that night, police interviewed Ochoa-Landa Verde at her house; she told them how the events unfolded and identified the shooter.

On the same day as her cousin's funeral, the shooter called Ochoa-Landa Verde and repeated his threat to kill her. He called again the next day with the same threat and told her that, although he was fleeing, others could harm her. The shooter called for a third time the following day, telling her:

> [H]e knew already that the police [were] looking for [him], and he was going to look for [her], he was going to find [her], he was going to kill [her], that he was going to cut off [her] head and he was going to throw it away in a trash fill so no one could ever find it.

A.R. at 135. He also sent her a threatening text message. Ochoa-Landa Verde then "changed the chip" in her phone and never directly heard from the shooter again. *Id.* at 135–36. She did not report the intimidating communications to the police because "they never do anything to help." *Id.* at 140.

After these events, Ochoa-Landa Verde left her home to live with relatives in a nearby town. She was there for about four weeks and then left for the United States. After her departure, individuals visited her mother's home in El Salvador, "destroyed the house," and left behind threatening letters. *Id.* at 136–37. Ochoa-Landa Verde believes that these individuals were gang

members sent by the shooter. Ochoa-Landa Verde later learned that three alleged gang members, including the shooter, had been arrested and detained in connection with the shooting at the rally. As of June 2019, Ochoa-Landa Verde believed that the gang members were still in custody.

Ochoa-Landa Verde applied for asylum and withholding of removal on the basis of her "political opinion" and "membership in a particular social group." *Id.* at 121–22; 155. She identified her particular social group as "El Salvadorans who have cooperated with the police" and "El Salvadorans who have cooperated with the police and have witnessed violence." *Id.* The IJ denied Ochoa-Landa Verde's applications and ordered her removed to El Salvador. On her asylum and withholding-of-removal claims, the IJ found that Ochoa-Landa Verde failed to demonstrate that the Salvadoran government was unable or unwilling to control the individuals whom she feared—a necessary showing to establish her "well-founded fear of persecution" from these private parties. *Id.* at 65. As for her CAT claim, the IJ found that Ochoa-Landa Verde did not present any credible evidence that the Salvadoran government would consent to, or acquiesce in, the torture that she feared would be inflicted upon her.

Ochoa-Landa Verde appealed the denials to the BIA, which issued a separate opinion affirming the IJ's decision and dismissing the appeal.

## II.

The BIA's opinion adopted much of the IJ's reasoning and added some of its own. When the BIA issues a separate opinion like this, and does not "summarily" affirm the IJ's decision, we "review the BIA's decision as the final agency determination." *Umaña-Ramos v. Holder*, 724 F.3d 667, 670 (6th Cir. 2013) (quoting *Hachem v. Holder*, 656 F.3d 430, 437 (6th Cir. 2011)). We also review the IJ's decision "[t]o the extent the BIA adopted the immigration judge's reasoning." *Id.* (quoting *Hachem*, 656 F.3d at 437). "Questions of law involving immigration proceedings are

reviewed de novo," *Ramaj v. Gonzales*, 466 F.3d 520, 527 (6th Cir. 2006), while we review factual challenges for substantial evidence, *Nasrallah v. Barr*, 140 S. Ct. 1683, 1692 (2020); *Garland v. Ming Dai*, 593 U.S. 357, 365 (2021). "Under the substantial-evidence standard, the IJ's and BIA's factual findings 'are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Zometa-Orellana v. Garland*, 19 F.4th 970, 976 (6th Cir. 2021) (quoting *Slyusar v. Holder*, 740 F.3d 1068, 1072 (6th Cir. 2014)).

**III.**

Ochoa-Landa Verde advances two main arguments on appeal. First, she argues that the IJ and BIA erred by denying her applications for asylum and withholding of removal under the INA. Second, she challenges the denial of her request for CAT relief. We consider these arguments in turn.

**A. Denial of Asylum and Withholding of Removal under the INA**

To obtain asylum, an applicant must show that she is "unable or unwilling" to return to her country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(B). For withholding of removal, an applicant faces "a more stringent burden than what is required on a claim for asylum," *Urbina-Mejia v. Holder*, 597 F.3d 360, 365 (6th Cir. 2010) (quoting *Liti v. Gonzales*, 411 F.3d 631, 640 (6th Cir. 2005)), and she must demonstrate "a clear probability that [s]he will be subject to persecution if forced to return to the country of removal," *Singh v. Ashcroft*, 398 F.3d 396, 401 (6th Cir. 2005) (quoting *Pilica v. Ashcroft*, 388 F.3d 941, 951 (6th Cir. 2004)).

For both types of claims, applicants must show that the persecution will be inflicted "by the government, or persons the government is unwilling or unable to control." *Khalili v. Holder*,

557 F.3d 429, 436 (6th Cir. 2009) (quoting *Pilica*, 388 F.3d at 950) (discussing withholding of removal); *Zometa-Orellana*, 19 F.4th at 976 (quoting *Pilica*, 388 F.3d at 950–51) (discussing asylum). More specifically, an applicant must demonstrate that "she cannot 'reasonably expect the assistance of the government' in controlling her perpetrator[s'] actions," *Juan Antonio v. Barr*, 959 F.3d 778, 793 (6th Cir. 2020) (quoting *Al-Ghorbani v. Holder*, 585 F.3d 980, 998 (6th Cir. 2009)), that the government "condoned" the private violence, or that the government "demonstrated a complete helplessness to protect the victims," *Palucho v. Garland*, 49 F.4th 532, 536 (6th Cir. 2022) (quoting *Kere v. Gonzales*, 252 F. App'x 708, 712 (6th Cir. 2007)).[1] The BIA "must consider the totality of the circumstances to answer this question," and courts "must treat the Board's answer to this question as an 'administrative finding[] of fact.'" *Palucho*, 49 F.4th at 536 (brackets in original) (quoting 8 U.S.C. § 1252(b)(4)(B)).

The BIA found "no clear error in the Immigration Judge's determination that [Ochoa-Landa Verde] did not show that the Salvadoran government was or would be unable or unwilling to protect her from the private actors who threatened her." A.R. at 4. The BIA also found no error in the IJ's finding "that the persons [she] fears are private actors either hired by the [Farabundo Marti National Liberation Front] and other political parties or were gang members." *Id.* at 5. It noted that police assisted Ochoa-Landa Verde after her cousin was shot: they came to her home and took a report, "which resulted in the arrest of the shooter and two other individuals, [who]

---

[1] Ochoa Landa-Verde argues that "withholding of removal, although a higher burden to prove, has a different analysis and elements than asylum that needs to be at the least meaningfully analyzed," and that it was inappropriate to rely upon the asylum determination to make a withholding-of-removal determination. D. 17 at pp.23–24. She continued that it would violate her due process rights under the Fifth Amendment to "[i]gnor[e] the withholding statute and simply deny[] relief based on the asylum standard." *Id.* at p.25. But the distinction in the standards pertains to how she had to demonstrate persecution "on account of" her membership in a particular social group, and not to the shared requirement that she show harm by persons whom the government is unwilling or unable to control. *See Turcios-Flores v. Garland*, 67 F.4th 347, 358 (6th Cir. 2023).

remain incarcerated." *Id.* Moreover, the BIA observed that Ochoa-Landa Verde had "never reported the threatening telephone calls she received after the shooting." *Id.* It ultimately rejected her "generalized assertions" that the government would be unable or unwilling to protect her because "corrupt security forces are involved with gangs and commit serious human rights abuses, and . . . political parties work with the gangs." *Id.*

Ochoa-Landa Verde has not shown that the BIA or the IJ erred. Substantial evidence cuts against Ochoa-Landa Verde's argument that the Salvadoran government was, or would be, unable or unwilling to protect her after she witnessed her cousin's murder. The police interviewed Ochoa-Landa Verde on the same day as the shooting, searched for the shooter, arrested him and two others in connection with the incident, and kept these individuals detained for at least four years. These facts indicate that the police investigated and pursued the perpetrators when they were given pertinent information. But Ochoa-Landa Verde did not continue to provide the police with information. Ochoa-Landa Verde did not report the threats she later received, and she does not appear to have reported the break-in at her mother's house, even assuming that the break-in was related to or orchestrated by the shooter. *See Palucho*, 49 F.4th at 541 ("[T]he intuition that no government can protect its citizens from activities that it is not made aware of applies" where applicants "never alerted the police about the [harmful activities]" (citation and internal quotation marks omitted)).

Ochoa-Landa Verde resists this conclusion, arguing that the BIA and IJ disregarded and did not address the evidence of the country conditions that she offered, which included information about the government's inability to control gang violence. But it appears that both the BIA and the IJ accounted for the country conditions while addressing Ochoa-Landa Verde's reasons for not reporting the threats to the Salvadoran authorities because of these conditions. Specifically, the

BIA referenced her "generalized assertions" about the "corrupt security forces." A.R. at 5. The IJ also acknowledged Ochoa-Landa Verde's argument that El Salvador has "difficulties in policing violence" and that "certain populations are more likely to be victims of crime." *Id.* at 65. Because neither the BIA nor the IJ ignored this record evidence, Ochoa-Landa Verde has failed to show that the BIA's and IJ's findings are "not 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Juan-Pedro v. Sessions*, 740 F. App'x 467, 470–71 (6th Cir. 2018) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)); *see Zometa-Orellana*, 19 F.4th at 979–80.

Ochoa-Landa Verde also contends that the IJ's reference to *Matter of A-B-*, 27 I. & N. Dec. 316 (A.G. 2018), in its analysis of whether the Salvadoran government was, or would be, unable or unwilling to protect her "alone constitutes an erroneous ground for remand," since that decision has since been vacated. *See Matter of A-B-*, 28 I. & N. Dec. 307, 309 (A.G. 2021) (vacatur); D. 17 at pp.28–29. The IJ cited *Matter of A-B-* to support the proposition that "[t]he mere fact that a country may have difficulties in policing violence or that certain populations are more likely to be victims of crime cannot itself establish an asylum claim." A.R. at 65. But in its review, the BIA specifically noted that the case had been vacated by the Attorney General and clarified that its "review of the Immigration Judge's findings is independent of *A-B-*[.]" *Id.* at 4–5 n.2. Instead, the BIA relied on *Ortiz*, where we observed that we have "repeatedly upheld the Board's rejection of a claim that the government was unable or unwilling to control a private party in part because the asylum applicant did not notify the government of the abuse." 6 F.4th at 690. As such, in ruling against Ochoa-Landa Verde, the BIA relied on our binding precedent.[2]

---

[2] Further, the IJ's conclusion regarding the Salvadoran government's ability or willingness to protect Ochoa-Landa Verde was not the only basis for the denial of the asylum and withholding-of-removal applications under the INA.

Because the BIA's findings are supported by substantial evidence, we deny Ochoa-Landa Verde's petition on her asylum and withholding-of-removal claims.

## B. Denial of CAT Relief

Under the CAT, immigration courts must grant deferral of removal to a noncitizen if she establishes that "it is more likely than not that . . . she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). "Torture is an extreme form of cruel and inhuman treatment" that is "specifically intended to inflict severe physical or mental pain or suffering." *Id.* §§ 1208.18(a)(2), (a)(5). To qualify for protection, such torture must be "inflicted by, or at the instigation of, or with the consent or acquiescence of, a public official acting in an official capacity or other person acting in an official capacity," *id.* § 1208.18(a)(1), and the risk must be "particularized," *Almuhtaseb v. Gonzales*, 453 F.3d 743, 751 (6th Cir. 2006) (quoting *Castellano-Chacon v. INS*, 341 F.3d 533, 551 (6th Cir. 2003)). An applicant can succeed on a CAT claim, which poses a "separate question of the threat of torture," even if her asylum and withholding-of-removal claims fail under the INA. *Mapouya v. Gonzales*, 487 F.3d 396, 414 (6th Cir. 2007) (quoting *Karomi v. Gonzales*, 168 F. App'x 719, 729 (6th Cir. 2006)).

In assessing the risk of torture, immigration judges must consider:

all evidence relevant to the possibility of future torture . . . including, but not limited to: (i) Evidence of past torture inflicted upon the applicant; (ii) Evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured; (iii) Evidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and (iv) Other relevant information regarding conditions in the country of removal.

8 C.F.R. § 208.16(c)(3). While immigration judges must consider evidence relevant to these regulatory factors, they do not need to "separate[ly] comment[] on every piece of evidence relating to these considerations." *Tello-Rivera v. Lynch*, 644 F. App'x 697, 700 (6th Cir. 2016).

The BIA agreed with the IJ that Ochoa-Landa Verde did not qualify for CAT protection because she did not show that the torture she feared was inflicted with the consent or acquiescence of the government. *See* 8 C.F.R. § 1208.18(a)(1). In reaching this conclusion, the IJ addressed the country conditions, finding that Ochoa-Landa Verde had "presented no credible evidence that the government of El Salvador engages in or acquiesces to the torture of political members from any particular party or to the torture of its citizens, especially given the fact that [her] own GANA political party controls the presidency at this time." A.R. at 66.

Ochoa-Landa Verde failed to prove that upon her return to El Salvador, she would suffer at the hands of gang members with the consent or acquiescence of government officials. Ochoa-Landa Verde testified that she was threatened by a private actor at a political event, and when police were informed of the death threat she received, they detained the perpetrator and other gang members. Ochoa-Landa Verde did not tell police about the other threats she received. And Ochoa-Landa Verde's generalized allegations that she would be tortured, based on country conditions, cannot form the basis for CAT relief. *See Cruz-Samayoa v. Holder*, 607 F.3d 1145, 1156 (6th Cir. 2010). Moreover, the record indicates that the Salvadoran government is making efforts to combat gang violence. "That the Salvadoran government is unable to control the gangs does not constitute acquiescence." *Zaldana Menijar v. Lynch*, 812 F.3d 491, 502 (6th Cir. 2015).

In sum, Ochoa-Landa Verde has failed to show that BIA and IJ erred in denying her CAT relief.

## IV.

For these reasons, we **DENY** Ochoa-Landa Verde's petition for review.